IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHEN L. WARNER, Executor of the Estate of GAGE W. ALLAM, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:19-cv-326 |
| v. | ) ) | |
| SHELL LEGACY HOLDINGS, LLC, et al., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**Susan Paradise Baxter, United States District Judge**

This protracted litigation arises out of a former class action styled *Walney, et al. v. SWEPI LP, et al*., No. 1:13-cv-102 (W.D. Pa.) in which class representatives Thomas J. Walney and Rodney A. Bedow, Sr. alleged that SWEPI LP and its general partner Shell Energy Holding GP, LLC breached the terms of certain Pennsylvania oil and gas leases by failing to pay bonus monies that were allegedly owed to class members under the subject leases.  On March 31, 2019, the Court granted the Defendants' motion to decertify the class after finding that the prerequisites for class certification under Federal Rule of Civil Procedure 23(b)(3) were no longer satisfied. *See Walney v. SWEPI LP*, No. CV 13-102, 2019 WL 1436938 (W.D. Pa. Mar. 31, 2019). Thereafter, many former class members continued the prosecution of their individual claims with the filing of this civil action.

At this procedural juncture, the following Plaintiff-lessors continue to pursue their breach of contract claims against Shell Legacy Holdings LLC (as successor in interest to SWEPI LP) and Shell Energy Holding GP LLC (collectively, the "Defendants"):  1. Gage W. Allam (through

Executor Stephen Warner); 2. Jenine A. Anthony; 3.  Sumner R. and Georgene Bemis; 4. Ronald and Judy Bickel; 5. Clayton L. and Connie L. Blauser; 6. Dennis R. and Angela D. Boocks; 7. Alma Lee Britt; 8. Warren Capenos (through executor Kathleen Barrett); 9. Barrett N. Clark and Marcia L. Gordon; 10. John L. and Dianna J. Erwin; 11. Robert Evans; 12. Robert E. and Pamela J. Exley; 13. Alfred L. and Robyn D. Freeman; 14. Florence R. Geibel; 15. Martin C. Geibel; 16. Clarence R. & Janice R. Guillinger; 17. Malcom L. and Sandy J. Guiste; 18. Michael P. and Beth A. Hutchinson; 19. Larry E. and Pamela J. Keverline; 20. Karen Latshaw; 21. Scott Michael Lewis; 22. Stephen J. and Barbara L. Lewis; 23. David J. McCune, III and Lauren E. McCune; 24. Tracy L. Miliara; 25. Marc J. Rasschaert; 26. Rodgers Holdings; 27. Robert D. Shaffer; 28. Carol Spellman Seltz (as Executor of the Estate of Harry J. Spellman and Helen M. Spellman); 29. Thomas J. Smerkar (through Executor Angela D. Books); 30. John L. and Evelyn K. Stewart; 31. John P. and Barbara A. Yakimick; and 32. Richard Zink.

The parties have filed multiple cross-motions for summary judgment which are now ripe for disposition.  The Court's rulings follow. [1]

## I.    FACTUAL BACKGROUND

SWEPI LP ("SWEPI") was, at times relevant to this litigation, an oil and gas exploration company that was engaged in leasing oil and gas interests from Pennsylvania landowners

---

[1]  The Court's subject matter jurisdiction is predicated on diversity of citizenship, pursuant to 28 U.S.C. §1332. As a federal court sitting in diversity, this court must apply the substantive law -- including the choice-of-law rules -- of the state in which this court sits.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

Here, the lease documents at issue were executed in Pennsylvania, by Pennsylvania landowners, and they involve the purported conveyance of oil and gas rights existing under Pennsylvania law.  As the parties agree that Pennsylvania law applies to the disputed contractual claims, the Court will similarly apply Pennsylvania law. *See Schiavone Constr. Co. v. Time, Inc.*, 735 F.2d 94, 96 (3d Cir.1984) ("The parties implicitly agree that New Jersey law governs, and the district court applied New Jersey law. Inasmuch as New Jersey has an interest in the outcome of this litigation ... we have no cause sua sponte to challenge that choice of law."); *84 Lumber Co., L.P. v. Bryan Const. Co.*, Case No. 2:09-cv-1030, 2011 WL 666209, at *5 (W.D. Pa. Feb.14, 2011) ("In this case, the parties do not dispute that Pennsylvania law applies to this case, and the Court need not engage in a choice of law analysis.").

between 2011 and 2013.  ECF No. 328, ¶3.  SWEPI sometimes interacted directly with the

landowners but, at other times, it acted through contracted landmen, including Southeast Land

Services, LLC ("Southeast"), which was SWEPI's principal independent contractor in Butler and

Venango Counties.  ECF No. 329-1, Haney Decl., at ¶1.

      As a general practice, SWEPI or its agents would initially identify individual landowners

who were believed to hold oil and gas rights and, if the landowner expressed an interest in

leasing its rights to SWEPI, the parties would then negotiate possible lease terms and bonus

payments.  ECF No. 328, ¶4.  Other companies were actively leasing in the same areas during

this time and, consequently, landowners would often negotiate with multiple oil and gas

companies at the same time they were negotiating with SWEPI or its contractors.  *Id.*, ¶5; ECF

No. 329-1, Haney Decl. at ¶ 6.

      Once lease terms were negotiated, SWEPI or its agents would obtain a signed oil and gas

lease from the landowner and issue a bank draft that was drawn on Amegy Bank, NA

("Amegy"), SWEPI's bank.  ECF No. 329-1, Haney Decl. at ¶4. The oil and gas lease consisted

of a pre-printed, form document with blank spaces for the date, the lessor's identity, the premises

in question, and the relevant signatures. *See, e.g.*, ECF No. 331-2 at 2-4.  Additional

individualized terms were set forth in an addendum to the lease form.  ECF No. 329-1, Haney

Decl. at ¶7.  Because Pennsylvania is a race-notice state, and because landowners were often

negotiating with multiple oil and gas companies at the same time, SWEPI also obtained from

each landowner a signed Memorandum of Lease ("MOL"), which SWEPI would then record

while it conducted a title examination for the subject oil and gas rights.  ECF No. 328, ¶5.

      The amount of the negotiated lease bonus was not specified in the form lease or

addendum but was instead set forth in the bank draft issued to the landowner.  ECF No. 329-1,

Haney Decl. at ¶8.  The drafts typically provided that, upon Amegy's receipt of the draft, SWEPI would have 90 banking days (or sometimes fewer banking days) "for title examination and for payment."  *See, e.g.,* ECF No. 331-2 at 11.  The drafts also contained language stating: "No liability for payment or otherwise shall be attached to any of the parties hereto."  *Id.*

After the form lease and the draft were exchanged and the MOL was recorded, SWEPI's agents would undertake an in-depth title search in the courthouse records to confirm that title to the oil and gas interest was in the acreage amount represented, that the title was in the names of the landowners who had signed the lease, and that no other problems existed anywhere in the chain of title for the oil and gas interest. ECF No. 329-1, Haney Decl. at ¶10.  To that end, SWEPI contracted with Southeast in Pennsylvania to do exclusive title searches and other research of title and then provide a confidential mineral interest ownership report and associated title run sheets exclusively to SWEPI regarding each parcel that SWEPI leased from a landowner. *Id.* at ¶12.

According to Ian Haney ("Haney"), who was SWEPI's Land Representative and "area focal point" in southwestern Pennsylvania, the title examination for each lease was a time-consuming process that required substantial manual research at the courthouses in Butler and Venango Counties.  In the first part of 2012, dozens of other companies were also taking leases from landowners and attempting to conduct title searches at the same time.  Due to the resulting congestion at the courthouse records office, the commissioners of Venango County imposed restrictions on access to the recorder's office in April 2012, limiting each company's representative to a maximum of 90 minutes per day.  Haney states that, as a result of these restrictions, SWEPI's title searches in Venango County were delayed substantially and many

could not be completed within the time allowed by the bank drafts for title examination. ECF No. 329-1, Haney Decl. at ¶13.

SWEPI's inability to complete courthouse title searches due to restrictions on courthouse access in the Spring and Summer of 2012 was a substantial reason why many drafts in Venango County were canceled and not paid.  In or about June 2012, SWEPI decided to stop taking new leases in most of Venango County and to cancel any outstanding drafts that had not already been paid.  SWEPI's decision was made for a combination of reasons, including the difficulties of completing title searches and title evaluation on a timely basis and a decrease in the commodity price of natural gas that made the Venango County area less attractive to SWEPI.  Thereafter, most Venango County drafts that had not already been paid were canceled and the leases formally surrendered back to the landowners. Some of those leases also had title problems that had been identified to the extent that SWEPI was able to complete some of the title searches. ECF No. 329-1, Haney Decl. ¶20.

In cases where the title examination *could* be completed, the examination did not always result in a finding that title was clean. Sometimes the title problems could be cured, e.g., by the signing of a new lease reflecting the correct acreage and the correct ownership names, which required cancellation of the bank draft and issuance of a new draft, if the landowner agreed. Other times, the title could not be readily cured, and SWEPI would cancel the bank draft and surrender the lease.  In any case, SWEPI made its decision whether to cancel or pay the draft prior to the due date on the instrument (usually 90 banking days).  SWEPI or its contract landmen would file written surrenders of the oil and gas lease in the county records. Once the lease surrender was recorded, the landowner was typically notified by letter of the surrender and

could then re-lease the oil and gas rights to another company. ECF No. 329-1, Haney Decl. at

¶¶14,18, 21.

The Plaintiffs in this action are among the landowners who signed lease forms and

MOLS for the benefit of SWEPI and who received bank drafts which were later cancelled. All

Plaintiffs assert a single cause of action for breach of contract relative to their respective

transactions.[2]

## II.    THE TRANSACTIONAL DOCUMENTS

Several pre-printed form documents (the "Transactional Documents") referenced above

inform the Court's analysis of the disputed transactions. The Court previously summarized the

pertinent provisions of these documents as follows in the *Walney* class action:

### A. The Form Lease Agreements

. . . Among the relevant documents are two materially identical lease agreements, i.e.,
"Paid Up Oil and Gas Lease, Rev. 06.09.2011" and "PA Paid Up Lease Rev. 05.01/2011" (ECF
Nos. 150–21 and 150–54, hereafter referred to collectively at times as the "Lease(s)" or the
"Lease Agreement(s)").

The introductory clause of each form Lease stated: "This Lease Agreement is made and
entered into this [enter date] between [enter landowner's name] as Lessor (whether one or more),
and SWEPI LP, having an office at 190 THORN HILL ROAD, WARRENDALE,
PENNSYLVANIA 15086, as Lessee." (ECF No. 150–21 (emphasis in the original).) Paragraph
1 of the Lease Agreement stated, in relevant part:

In consideration of the bonus consideration paid, the receipt of which is hereby
acknowledged, and in further consideration of the covenants and agreements herein
contained, Lessor does hereby grant, demise, lease and let exclusively to Lessee, its
successors and assigns, the lands hereafter described for the purpose of exploring for,
developing, producing and marketing oil, gas or other related substances produced in
association therewith ... in and under the following described land....

(Id.) Paragraph 3 of the Lease established a primary lease term of five years which, at SWEPI's
option, could be extended if SWEPI made a specified extension payment, calculated on a "per
acre" basis, prior to the expiration of the primary term. (Id. ¶ 3.) Paragraph 4 set forth the lessor's
entitlement to an 18% royalty payment for oil and gas produced and marketed from the leased

---

[2] Plaintiffs Ronald and Judy Bickel were issued two (2) drafts and assert separate claims on each draft. Plaintiff
Clarence R. Guilinger was likewise issued two (2) drafts and is pursuing separate claims for each draft. Plaintiff
Rogers Holdings was issued three (3) drafts and is pursuing claims on each draft.

premises. (Id. ¶ 4.) Paragraph 10 of the Lease provided, in part, that: "Lessee at any time, and from time to time, may surrender this lease as to all or any part thereof by recording an appropriate instrument of surrender in the proper county and thereupon this lease and the rights, rentals and obligations of the parties hereunder shall terminate as to the part so surrendered." (Id. ¶ 10.) Paragraph 14 set forth a "force majeure" clause. (Id. ¶ 14.) Paragraph 15 ensured that "[n]o default shall be declared against the Lessee for failure to make payment or perform any conditions provided for herein unless the Lessee shall refuse or neglect to pay or perform the same for sixty (60) days after having received written notice from Lessor." (Id. ¶ 15.) Paragraph 17 acknowledged:

> This lease contains all of the agreements and understanding of the Lessor and Lessee respecting the subject matter hereof and no implied covenants or obligations, or verbal representations or promises have been made or relied upon by Lessor or Lessee supplementing or modifying this lease or as an inducement thereto.

(Id. ¶ 17.)

**B. The Form Draft Instrument**

Also relevant is the form draft instrument (hereafter, "Draft(s)" or "Draft Instrument(s)") that SWEPI issued to landowners in exchange for the signed Leases. Each Draft Instrument contained standard language stating: "This draft when paid is payment in full for lease or conveyance covering the following described land: [enter description]." (ECF No. 150–30.) Each instrument contained the language "No Protest" and "Not a Cash Item." (Id.) The Drafts further provided that:

> [t]he payor shall have ___ banking days after receipt of this draft by the collecting bank, whether accompanied by other papers or not, for title examination and for payment. Neither forwarding bank nor payee(s) nor the grantor(s) of such lease or conveyance may demand return of this draft or any accompanying papers prior to expiration of the time fixed. Upon payment hereof collecting bank shall deliver this draft and any accompanying papers to payor and remit payment to forwarding bank. No liability for payment or otherwise shall be attached to any of the parties hereto.

(Id.)

**C. The Memorandum of Lease**

The third standard document is the form MOL that class members executed and delivered to SWEPI's landmen along with their signed Leases. The first two sentences of each MOL state that: "THIS MEMORANDUM OF LEASE has been made to indicate the existence of an Oil and Gas Lease ("Lease") dated [ enter date] by and between [landowner] of [subject property], as Lessor and SWEPI, LP ... as Lessee. Lessor did grant, demise, lease and let exclusively to Lessee, its successors and assigns, the rights to explore, develop, produce, and market oil and gas from [the subject property] subject to the provisions contained in the Lease...." (ECF No. 150–23.) Paragraph 1 of the MOL further provides that:

> The primary term of the Lease is for a period of Five (5) years commencing on the date immediately set forth above and for so long thereafter as oil, gas or other substances covered by the Lease are capable of being produced in paying quantities from the leased premises or from lands pooled therewith or the Lease is otherwise maintained or

> prolonged pursuant to the provisions contained in the Lease, including an extension of term contained therein. Lessee may extend the primary term of the Lease for an additional Five (5) years after the end of the primary term, thereby continuing the term of the Lease to the end of the extended primary term.
>
> (Id.) Elsewhere, the MOL acknowledges that its intended purpose is to "provid[e] notice in the Recorders Office of [enter county] County, Commonwealth of Pennsylvania, of the existence of the Lease," and it "shall not be considered in any way a modification or alteration of the Lease." (Id.)

*Walney v. SWEPI, LP,* 311 F. Supp. 3d 696, 703-05 (W.D. Pa. 2018), *vacated in non-relevant part,* 596 F. Supp. 3d 544 (W.D. Pa. 2022).

## III.    THE PARTIES' RESPECTIVE ARGUMENTS

The gravamen of this litigation concerns whether SWEPI owes each Plaintiff payment for the bonus amounts that were negotiated relative to their leases.  Underlying this larger dispute are many subsidiary disagreements about, *e.g.,* whether an enforceable agreement existed between the parties, what documents comprise such an agreement, what the terms of the agreement were, whether any obligation on SWEPI's part to pay bonuses was excused or ever arose in the first place, and whether the Plaintiffs' chosen remedy is unavailable because of existing title issues.  Each side asserts that it is entitled to summary judgment as a matter of law.

### A.  Plaintiffs' Position

Plaintiffs contend that the contracts at issue consist only of the signed lease forms along with the personalized addenda.  Plaintiffs regard the MOL and draft instruments as external to the contract but still admissible evidence of the parties' intent insofar as they do not contradict the terms of the parties' agreement.

Plaintiffs assert that each lease is an enforceable contract. They reason that SWEPI manifested its intention to be bound by lease terms when it presented the form leases to the landowners for execution and also when it accepted signed leases and recorded the

corresponding MOLs. Plaintiffs posit that the terms of the lease agreements are sufficiently definite and are supported by mutual consideration, namely, a bonus payment, which was to be paid contemporaneously with the landowners' execution of the lease.

Plaintiffs deny that the terms of the draft modified the lease terms by delaying the time for payment. They view the draft as a medium of payment, or a method of performance only, as opposed to a document embodying contractual terms. Further, they insist that the "no liability" language in the drafts must be strictly construed as affecting only the draft as a medium of payment as opposed to negating SWEPI's payment obligation.

Plaintiffs argue that SWEPI never properly rescinded the leases but, instead, cancelled them. They insist that SWEPI's stated reasons for doing so – namely, its inability to complete its title search within the time periods contemplated in the draft and changing market conditions – are invalid. And because Plaintiffs believe that the leases were not rescinded in a timely manner, they insist that specific performance (in the form of full payment of the draft amounts) remains the appropriate remedy.

### B. Defendants' Position

Defendants contend that the Transactional Documents did not give rise to any enforceable contract between SWEPI and the Plaintiffs. They reason that, consistent with applicable trade custom and usage, there could be no enforceable lease agreement unless and until SWEPI first verified that the lessor had clean and marketable title to the subject oil and gas interest and then paid the bonus amounts. Because those conditions did not occur, Defendants insist that no binding contracts were formed. In addition, Defendants assert that none of the remaining Plaintiffs had clean and marketable title, so the lease agreements failed for lack of consideration.

To the extent enforceable agreements existed, Defendants assert that SWEPI's obligation to fund the drafts was excused. Defendants maintains that certain Plaintiffs never presented their drafts to their banks and, as a result, SWEPI's duty to pay was never triggered. Defendants further insist that SWEPI's surrender of the lease agreements and cancellation of the drafts was justified in every case because each of the remaining Plaintiffs lacked clean and marketable title to the oil and gas interests they were attempting to lease. Further, Defendants contend that the "No Liability" clause in the drafts permitted SWEPI to cancel the drafts for any reason, or for no reason at all. Finally, Defendants posit that SWEPI was justified in refusing payment for those Plaintiffs as to whom the title search could not be completed within the allotted time frame.

Assuming that enforceable contracts and contractual breach are established, Defendants assert that Plaintiffs cannot recover the damages they seek as a matter of law. They contend that Plaintiffs cannot recover through specific performance because they cannot convey clear and marketable title to the oil and gas interests at issue. And even if that were not so, Defendants argue, some damage claims are defeated by the lessor's failure to mitigate damages, while other claims fail because their alleged damages were fully mitigated.

## IV.    STANDARD OF REVIEW

### A. *Federal Rule of Civil Procedure 56*

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, a defendant may obtain summary judgment by pointing to the absence of a genuine fact issue on one or more essential elements of the plaintiff's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (holding that "a complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial"). A plaintiff may obtain summary judgment by producing "credible evidence that would entitle [the plaintiff] to a directed verdict if not controverted at trial." *In re Bressman*, 327 F.3d 229, 237 (3d Cir. 2003) (cleaned up).

For purposes of Rule 56, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A factual dispute is "genuine" only if the "'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). And a fact is material only if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 248). When determining whether a genuine issue of material fact remains for trial, the court must "view all 'the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Physicians Healthsource, Inc.*, 954 F.3d at 618 (quoting *Stone v. Troy Constr., LLC*, 935 F.3d 141, 147 n.6 (3d Cir. 2019)).

Relevantly, courts are permitted to resolve cross-motions for summary judgment concurrently. *Johnson v. Federal Exp. Corp.*, 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014) (citing authority); *see Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008) (considering cross-motions for summary judgment under the Fair Labor Standards Act); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2014). "When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion." *Johnson*, 996 F.Supp.2d at 312; *see Lawrence*, 527 F.3d at 310 (noting that the rule for granting summary judgment "is no different where there are cross-motions for summary judgment.").

11

*B.  Local Rule 56*

Local Rule 56 requires that a motion for summary judgment be accompanied by a separately filed concise statement of material facts, which includes citations to the record "supporting the party's statement, acceptance, or denial of the material fact[.]" LCvR 56(B)(1). Plaintiffs have provided individualized, but materially similar, statements of fact in support of their Rule 56 motions.  Commonly, these concise statements do not provide any citation to record evidence in support of the assertions at Paragraphs 8, 9, 14, and 15.  Accordingly, the Court will not consider these assertions by the Plaintiffs.

Local Rule 56 further provides that a nonmovant must submit a "separately filed concise statement, which responds to each numbered paragraph in the moving party's Concise Statement of Material Facts...." LCvR 56(C)(1).  The rule states that "[a]lleged material facts set forth in the moving party's Concise Statement of Material Facts . . . , which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party."  LCvR 56(E).

Plaintiffs failed to file any responsive Concise Statement(s) of Material Fact in response to Defendants' concise statements at ECF Nos. 324 and 328, as required by Local Rule 56(C)(1). Accordingly, for purposes of deciding Defendants' Rule 56 motions, the Court will accept as "admitted" those assertions in the Defendants' Concise Statement of Material Facts that are factual, supported by the evidence, and alleged to be undisputed, unless the Court's review of the record counsels otherwise.  The Court will not deem Defendants' allegations "admitted" to the extent they are unsupported by relevant evidence and/or to the extent they involve assertions of contract interpretation or other legal matters reserved for the Court.  *See Weitzner v. Sanofi*

*Pasteur Inc.*, 909 F.3d 604, 613 (3d Cir. 2018) (recognizing the district court's inherent

discretion in interpreting and applying its own local rules); *Heckman v. N. Penn Comprehensive*

*Health Servs.*, No. 4:20-CV-01680, 2024 WL 2902169, at *2 (M.D. Pa. June 10, 2024) (noting

that "the proper sanction for violating Rule 56.1 is within the district court's discretion").

## V.     DISCUSSION

### A.  *Governing Legal Principles*

Under Pennsylvania law, a plaintiff must establish the following to satisfy a claim for

breach of contract: "(1) the existence of a contract, including its essential terms; (2) a breach of a

duty imposed by the contract; and (3) resultant damages." *Kapotas v. CTP Funding, LLC,* No.

2:24-CV-01995, 2025 WL 2250003, at *3 (E.D. Pa. Aug. 6, 2025).  Oil and gas leases are in the

nature of contracts and, therefore, they are controlled by principles of contract law.  T.*W. Phillips*

*Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012).

The ultimate goal of contract interpretation is to determine the parties' intent as expressed

in the contract's language.  *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563,

566 (Pa. 1983); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 282 and n.50 (3d Cir. 2014).

Where the language of the agreement is clear and unambiguous, courts must give effect to its

plain meaning.  *Prudential Prop. & Cas. Ins. Co. v. Sartno*, 903 A.2d 1170, 1174 (Pa. 2006);

*Blunt*, 767 F.3d at 282 n.50.  Contract terms are ambiguous "if they are subject to more than one

reasonable interpretation when applied to a particular set of facts." *Commonwealth ex rel. Kane*

*v. UPMC,* 129 A.3d 441, 463 (Pa. 2015) (quotation omitted).  "When . . . an ambiguity exists,

parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of

whether the ambiguity is patent, created by the language of the instrument, or latent, created by

extrinsic or collateral circumstances. *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004).  "'While

ambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.'" *Dressler Family, LP v. PennEnergy Resources, LLC*, 276 A.3d 729, 737 (Pa. Super Ct. 2022) (quoting *Kripps*, 849 A.2d at 1163)).

In ascertaining contractual intent, courts must be guided by the plain meaning of the language employed by the parties rather than their "silent intentions." *Jedlicka*, 42 A.3d at 267. "Courts are not to assume that the language contained in a contract was chosen carelessly or that the parties were ignorant of the meaning of the language they utilized." *Kmart of Pennsylvania, LP v. MD Mall Assocs., LLC*, 959 A.2d 939, 944 (Pa. Super. Ct. 2008). Further, courts must interpret contracts to give effect to all their provisions. *Commonwealth ex rel. Kane*, 129 A.3d at 464 ("[O]ur Court will not interpret one provision of a contract in a manner which results in another portion being annulled.") (quotation omitted).

While bearing these general principles in mind, the Court also recognizes that "every agreement is made and to be construed with due regard to the known characteristics of the business to which it relates . . . and hence, the language used in a contract will be construed according to its purport in the particular business, although this results in an entirely different conclusion from what would have been reached had the usual meaning been ascribed to those words." *Camp Ne'er Too Late, LP v. SWEPI, LP*, 185 F. Supp. 3d 517544 (MD. Pa. 2016) (ellipsis in the original; citation and quotation marks omitted). Relevantly, "[i]nstruments conveying property rights in minerals such as oil and gas are executed in the context of an industry that is highly technical in nature and employs district terminology used by those involved in the business." *Jacobs v. CNG Transmission Corp.*, 332 F. Supp. 2d 759, 764 (W.D. Pa. 2004). Thus, "[a]n understanding of the historical development of the industry is essential in making an informed assessment concerning the intent of the parties in employing the language

utilized in a particular instrument." *Id.*; *see Chambers v. Equinor USA Onshore Props. Inc.*, No. 3:18-CV-00437, 2024 WL 4109340, at *5 (M.D. Pa. Sept. 6, 2024) ("[W]hen interpreting oil and gas production leases, courts typically defer to the historical understanding of the terms used, prior judicial decisions, and experts in the oil and gas field to interpret the lease terminology.") (citing *Wiser v. Enervest Operating, L.L.C.*, 803 F. Supp. 2d 109, 117 (N.D.N.Y. 2011)).

    *B.  What Are the Relevant Contractual Documents?*

    As an initial matter, the Court must determine what documents comprise the alleged contracts.  As noted, the parties disagree on this point.

    Plaintiffs posit that the contracts consist solely of the signed lease forms, together with their addenda.  In support of this view, they cite Paragraph 17 of the form lease, which states that the lease "contains all of the agreements and understanding of the Lessor and Lessee respecting the subject matter hereof and no implied covenants or obligations, or verbal representations or promises have been made or relied upon by Lessor or Lessee supplementing or modifying this lease or as an inducement thereto." *See, e.g.*, ECF No. 331-2 at 4.

    Plaintiffs also point to Paragraph 1 of the Lease, which refers to "bonus consideration *paid*, the *receipt* of which [the lessor] hereby acknowledged . . . ." *See, e.g.*, ECF No. 331-2 at 2 (emphasis added).  Plaintiffs interpret this language as a straightforward promise by SWEPI to pay the bonus monies either before or upon the landowner's execution of the lease, in the form of legal tender.  Because SWEPI did not do so, Plaintiffs conclude that SWEPI breached the lease terms and is liable for the bonus amounts as a matter of law.

    As for the drafts, Plaintiffs insist they cannot be considered part of the contract because the landowners did not sign the drafts or any document agreeing to the draft provisions.  Even if they had done so, Plaintiffs argue, the draft provisions cannot stand because their effect would be

to annul the lease provisions referring to "bonus consideration paid, the receipt of which is hereby acknowledged." Plaintiffs thus deny that the drafts afforded SWEPI a delayed period for title examination or a waiver of its liability under the leases; "title examination" and "no liability" clauses, they argue, were unilaterally inserted into the draft by SWEPI and unsupported by separate consideration. Plaintiffs thus view the drafts as merely parol documents whose terms should be read as setting forth the means of performance -- i.e., pertaining to payment of the *draft*, rather than payment of the *bonus*.

Defendants have consistently denied that any enforceable contracts exist between SWEPI and the remaining Plaintiffs. But to the extent any enforceable agreements *do* exist, Defendants argue that they are, at most, conditional contracts consisting of the form lease agreements, the lease addenda, and the drafts. To that end, Defendants note that all of the Transactional Documents were exchanged contemporaneously as part of the same transaction. And rather than varying the terms of the lease agreement, Defendants argue, the drafts supply essential contractual terms.[3]

On this initial point, the Court concludes that Defendants have the better argument. Pennsylvania courts have held that, "'[w]here several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other.'" *Jeddo Coal Co.*, 2017 WL 937737, at *4 (quoting *Huegel v. Mifflin Const. Co.*, 796 A.2d 350, 354–55 (Pa. Super. Ct. 2002)); *see Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 107 (3d Cir. 1986) ("It is a general rule of contract law that where two

---

[3] Defendants also argue that Plaintiffs are judicially estopped from asserting that the drafts are not part of the contractual documents, as they previously took the opposite position. The Court need not address whether Plaintiffs are estopped from making the arguments in their briefs because, as explained in more detail below, the Court rejects Plaintiffs' argument on the merit.

writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties.").

As the Court previously observed in the *Walney* class action, "the Transactional Documents were typically signed and exchanged contemporaneously as part of a singular transaction between SWEPI and the various [landowners]." *Walney v. SWEPI LP*, 311 F. Supp. 3d 696, 708 (W.D. Pa. 2018).  That fact remains true in this litigation.  *See* ECF No. 329-1, Haney Decl. at ¶4; *see also* ECF No. 442 at 22.

In addition, as the Court noted in *Walney,*

> the [Transactional Documents] reference one another. The Leases expressly acknowledge the lessor's receipt of a "bonus" in an unspecified amount. . . . The Draft Instruments indicated that, when funded, they would constitute "payment in full for lease or conveyance" covering the specific parcel in question. . . . . Each MOL was expressly intended to provide public notice of the existence of the corresponding oil and gas lease[.]

311 F. Supp. 3d at 708.  Thus, given that the form leases and drafts "refer to each other" and were "exchanged contemporaneously as part of a singular transaction," *id.*, this Court "will construe the writings together for the purpose of ascertaining the parties' intent[,]" just as the Court did in the *Walney* class action. *Id.*  The Court adheres to this view, notwithstanding the integration clause in Paragraph 17 of the lease.  *See Kropa v. Cabot Oil & Gas Corp.*, 609 F.Supp.2d 372, 378 (M.D. Pa. 2009) (predicting that "the Pennsylvania Supreme Court would not strictly apply the parol evidence rule where two contracts must be read together and only one has an integration clause"), *on reconsideration in part*, 716 F. Supp. 2d 375 (M.D. Pa. 2010); *Amin v. Lammers*, No. Civ. A. 94-5980, 1995 WL 231048, at *4 (E.D. Pa. April 18, 1995) ("[T]he presence of integration clauses in the separate agreements is not a bar to the agreements

being construed together when the agreements are part of the same business transaction.") (citations omitted); *see Walney*, 311 F. Supp. 3d at 708 n.8.

Nor is it dispositive that the Plaintiffs did not personally "execute" the drafts or sign a document separately agreeing to the draft provisions. SWEPI, of course, *did* execute the drafts through its agents, and it is clear from the context of the transaction as a whole that the draft was intended to be the medium through which bonus payments would be made. In fact, if the drafts were not included as a part of the contractual agreement, the leases would generally fail to state an essential term -- namely, the bonus amount that SWEPI allegedly agreed to pay. *See Azer Sci. LLC v. Quidel Corp.*, No. 24-1022, 2025 WL 2319653, at *2 (3d Cir. Aug. 12, 2025) (noting that a contract's "essential terms" include the "'time or manner of performance, price to be paid, or the like'") (quoting *Lombardo v. Gasparini Excavating Co.*, 123 A.2d 663, 666 (Pa. 1956)).

Accordingly, the Court will construe the Transactional Documents together as a whole in ascertaining the parties' intent. *See Kroblin Refrigerated Xpress, Inc.*, 805 F.2d at 107.

### C. Is There an Enforceable Contract?

The Court must next determine whether the lease agreements at issue were enforceable contracts. Under Pennsylvania law, a contract is formed where "(1) 'both parties manifested an intention to be bound by the agreement'; (2) 'the terms of the agreement are sufficiently definite to be enforced'; and (3) 'there was consideration.'" *Azer Sci. LLC*, 2025 WL 2319653, at *2 (quoting *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 666 (3d Cir. 1998) (applying Pennsylvania law) and citing *Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman,* 795 F.2d 291, 299 (3d Cir. 1986) (same)). Here, Defendants contest the first and third elements. The Court finds that Defendants' challenge based on an alleged failure of consideration lacks merit; therefore, that element is satisfied. However, as to the first element,

the Court finds that there is a genuinely disputed material issue of fact as to whether the parties manifested a mutual intent to be contractually bound.

    1.  <u>Was There Mutual Intent to be Contractually Bound?</u>

In the *Walney* class action, the Court found that the requisite contractual intent could be inferred from the language of the Transactional Documents and the conduct of the parties. Although this Court later reopened that issue to allow for further discovery on the issue of industry custom and usage as it pertains to contractual intent, the undersigned remains of the view that one *could* reasonably interpret the Transactional Documents as manifesting the parties' intent to enter into a binding contract as of the date the documents were exchanged. As was true in the *Walney* class action,

> each [plaintiff], upon signing and delivering their Leases and MOLs, was given a Draft, signed by SWEPI's agent, in the amount of the negotiated bonus payment. As discussed, each Lease was, by its own terms, expressly "made and entered into" by the parties as of the date that the Transactional Documents were signed and exchanged, and each Lease specifically stated that the lessor "does hereby grant, demise, lease and let exclusively to Lessee ... the lands hereafter described...." (ECF No. 150–21.) Each MOL similarly acknowledged "the existence of an Oil and Gas Lease" whose primary term commenced on the same date that the Lease Agreement was executed. (ECF No. 150–23.) In addition, each MOL expressly stated that "Lessor did grant, demise, lease and let exclusively to Lessee ... the rights to explore, develop, produce, and market oil and gas from the premises described below subject to the provisions contained in the Lease ..." (Id.)

311 F. Supp. 3d at 721. Taken together, this language and the contemporaneous exchange of the Transactional Documents can reasonably be viewed as evidence of mutual contractual intent.

Defendants, however, deny that there was a mutual intent to be contractually bound. They argue that, pursuant to Pennsylvania custom and usage, no enforceable contract could exist until SWEPI: (i) verified the lessor's clean and marketable title to the subject oil and gas interests, and

(ii) paid the bonus amount. Because those things did not happen, SWEPI argues, no binding contracts were formed.

In support of this argument, Defendants point to the unrebutted report of Attorney Lisa McManus, whom they have proffered as an expert in Pennsylvania oil and gas industry custom and practice. The record reflects that Ms. McManus has practiced law in Pennsylvania since 1990, with a focus in the area of oil and gas law dating back to 2007. ECF No. 329-2 at 7-8. In the course of her career, Ms. McManus has performed hundreds of real estate title searches, certified hundreds of titles, reviewed hundreds of oil and gas title abstracts, and issued approximately 200 title opinions for oil and gas in this Commonwealth. *Id.* Her clients have included both major and independent oil and gas companies, and she currently serves as General Counsel and Vice-President, Legal for Pennsylvania General Energy Company, LLC. She is also an Executive Board Member and Secretary of the Marcellus Shale Coalition, the largest shale trade association in Pennsylvania. Id. at 8-9. Among other activities, Ms. McManus has authored numerous articles on oil and gas law and has frequently lectured and planned continuing legal education programs regarding oil and gas law for the Pennsylvania Bar Institute. Id. at 9.

In her expert report, Ms. McManus opines that custom and practice exists in the Pennsylvania oil and gas industry as to matters of title, leasing and payment to lessors. ECF No. 329-2 at 7. In relevant part, she attests to the following, as it relates to the custom and practice of using draft instruments to pay lease bonuses:

> Sight drafts are commonly utilized by oil and gas exploration and development companies to pay "bonus" consideration due under an oil and gas lease, although many other operators employ orders of payment. Although the draft states that it is payable to the named payee, a draft is not a check. Rather, it is an order to pay a specified amount to a payee by a specified date. Unlike a check, a sight draft typically contains contingencies that must occur before the bank is authorized to release the funds, such as approval of the lease and/or verification of title.[1]

In the context of oil and gas leasing transactions, the draft names the lessor as the payee and the lessee as the drawee. The lessor endorses the draft and deposits it with his or her bank, which is known as the forwarding bank. The draft is not funded immediately. Rather, the forwarding bank sends the draft to the lessee's bank, which acts as the collecting bank and holds the draft until the lessee, as drawee, either pays the draft or the time for payment expires.

It is understood and custom in the industry that when a purchaser uses a sight draft with language imposing a condition of approval of title or geology, that language creates a condition precedent to the formation of a contract. In other words, no enforceable lease exists until the condition precedent is either performed or waived. Many drafts further include "no liability" exculpatory language that provides that if the draft is not paid within the set time, the collecting bank shall return the same to the forwarding bank, and no liability for payment shall attach to any of the parties. Such effect cuts both ways, as either lessor or lessee could refuse to consummate the transaction.[1] Because recording is required to provide public notice of the existence of a potential encumbrance of the oil and gas interest, the recording of a memorandum of the lease does not alter the lease's conditional nature or impose liability on the lessee if the draft is later dishonored.

As prior landowner counsel, I consistently advised my clients not to accept a draft from a lessee because a draft generally allows the lessee to refuse to fund it, thereby rendering the lease a nullity.[1] My advice to clients was to obtain an order of payment setting a definite date upon which payment was to be made with no conditions other than defensible title. Since at least 2009, a multitude of mineral owner blogs, forums, and other online resources (including attorney websites) have provided similar advice, and the drawbacks to the usage of drafts in the oil and gas lease context have been generally known or easily ascertained by those entering oil and gas leases.

Moreover, since the advent of the development of the Marcellus Shale, numerus attorneys and consultants in Pennsylvania have advertised their services as including oil and gas representation, including providing advice on oil and gas leases. . . .

Attorneys who provide such advice would know or should know the limitations on the use of drafts and should counsel their clients regarding those risks.

ECF No. 329-2 at 19-22 (internal footnotes omitted).

Plaintiffs argue that the Court should not consider the Defendants' custom and usage evidence. They lodge three reasons for disregarding Ms. McManus' report: (i) her opinion constitutes a conclusion of law that is solely within the purview of this Court, (ii) her report fails to comply with the requirements of Federal Rule of Civil Procedure 26(a)(2) and Federal Rule of Evidence 702, and (iii) Defendants have not shown that Plaintiffs were aware of the custom and usage that Ms. McManus identifies.

As to the first objection, the undersigned does not construe Ms. McManus' report as an attempt to interpret the leases that are presently before the Court or to specifically opine on their enforceability.  Instead, the Court accepts Ms. McManus testimony only as a statement as to how conditional sight drafts with "no liability" clauses are customarily treated by parties to a Pennsylvania oil and gas lease.  The existence and scope of an industry usage are considered factual issues.  *See, e.g., Sun Oil Co. v. Wortman*, 486 U.S. 717, 732 n.4 (1988); Restatement (Second) of Contracts §219, Comment a and §222(2); *Trustees of Univ. of Pa. v. St. Jude Children's Research Hosp.,* 982 F. Supp. 2d 518, 537 (E.D. Pa. 2013).  Moreover, expert testimony is appropriate to establish custom or usage in a case involving alleged contractual breach. *See, e.g., Borden v. Mainline Conveyor Systems, Inc*., Civil Action No. 4:23-CV-1486, 2025 WL 2045736, *4 (M.D. Pa. July 21, 2025) (noting that testimony from an expert in a particular industry may be admissible if the expert is testifying to "customs and practices of a particular industry"; however, "an expert may not testify as to the law governing the case or as to legal duties arising out of a specific contract") (citations omitted); *Chambers v. Equinor USA Onshore Properties Inc*., Civil Action No. 3:18-cv-437, 2024 WL 4109340, *5 (M.D. Pa. Sept 6, 2024) ("[W]hen interpreting oil and gas production leases, courts typically defer to the historical understanding of the terms used, prior judicial decisions, and experts in the oil and gas field to interpret the lease terminology."); *General Refractories Co. v. First State Ins. Co*., 94 F. Supp. 3d 649 (E.D. Pa. 2015) (court relying on expert testimony regarding insurance industry usage to resolve ambiguity in an insurance policy).  Thus, the undersigned finds that Ms. McManus' report on these matters does not improperly stray into the area of contractual interpretation reserved for this Court.

Plaintiffs' second objection is that Ms. McManus' opinions lack a proper factual foundation, and thereby violates Rule 26 of the Federal Rules of Civil Procedure as well as Federal Rule of Evidence 702.  Rule 26(a)(2) addresses expert disclosures and provides that an expert report must contain, among things, "the facts or data considered" by the expert witness in forming her opinions.  *See* Fed. R. Civ. P. 26(a)(2)(ii).  Rule 702 allows a witness "qualified as an expert by knowledge, skill, experience, training or education" to "testify in the form of an opinion or otherwise" if the proponent can show it is "more likely than not" that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  While Ms. McManus bases her report on her "education and extensive professional experience involving real estate title, oil and gas title, and abstracting[,]" ECF No. 329-2 at 23, Plaintiffs object that "she posits no facts evidencing that she, or anyone else in the industry, has relied on this custom in an actual transaction."  ECF No. 443 at 4.

Plaintiffs' second objection lacks merit.  In essence, Plaintiffs are raising a *Daubert*[4] challenge under the guise of a Rule 56 argument.  "[T]he Third Circuit has cautioned courts that expert challenges under *Daubert* require full development of the facts and evidence to provide the parties with a full opportunity to be heard on the issue." *Est. of Borroto v. CFG Health Sys., LLC,* 751 F. Supp. 3d 443, 468 (D.N.J. 2024) (citing *In re Paoli Railroad Yard PCB Litigation,* 916 F.2d 829, 855 (3rd Cir. 1990) (holding exclusion of expert evidence provided grounds to set

---

[4] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

aside grant of summary judgment where plaintiffs did not have an in *limine* hearing and were denied oral argument on evidentiary issues) and *Padillas v. Stork–Gamco, Inc.*, 186 F.3d 412, 417-18 (3d Cir. 1999) (holding that the district court abused its discretion in excluding an expert's opinion without conducting an in *limine* hearing focused on the *Daubert* reliability of his testimony)). Here, no *Daubert* motion or motions in *limine* have been filed in connection with this case, and Plaintiffs' Rule 56 arguments on the matter are extremely truncated. Accordingly, it would be inappropriate to exclude Ms. McManus' report at this juncture on the basis of the very limited record before the Court. For these reasons, the Court will not discount Ms. McManus' expert report on the basis of Plaintiffs' Rule 702 challenge. To the extent Plaintiffs' arguments concern the weight, rather than the admissibility, of Ms. McManus' opinions, the Court simply notes that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty-Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

To that end, the Court considers Plaintiffs' third objection to Defendants' custom and usage evidence -- namely, that the evidence should be rejected because Defendants have failed to establish Plaintiffs' awareness of the alleged custom or usage. Defendants dispute that Plaintiffs' awareness of the custom or usage is necessary or relevant.

"In the law of contracts, custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts and does not depend on any obvious ambiguity in the words of the contract." *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001). "If words have a special meaning or usage in a particular industry, then members of that industry are presumed to use the words in that special way, whatever the words

mean in common usage and regardless of whether there appears to be any ambiguity in the words." *Id.*

In the *Walney* class action, the Court stated that "this rule of construction has application only where both parties to the contract are familiar with the particular trade usage by virtue of being engaged in a particular industry, or otherwise have reason to know of it." *Walney*, 311 F. Supp. 3d at 718 (citing authority), *on reconsideration*, 2018 WL 4076919 (W.D. Pa. Aug. 27, 2018). The Court was unable to draw any conclusive inferences regarding the class members' awareness of the proffered industry customs and usages; therefore, the Court determined that the evidence as to custom and usage was not dispositive. *Id.* at 719.

Here, Defendants argue that Plaintiffs' knowledge of the custom and usage discussed by Ms. McManus is irrelevant. They cite to *Carey v. Bright*, 58 Pa. 70, 82 (1868) and *Roe v. Chief Exploration & Dev. LLC*, 2013 WL 4083326 (M.D. Pa. Aug. 13, 2013), neither of which the Court views as particularly strong authority for Defendants' position, as the issues of actual or constructive knowledge were neither challenged nor addressed in those cases.

Yet it is apparent from this Court's own research that the rule as stated in the *Walney* class action is the correct one -- *to wit*, the parties must at least have *reason to know* of the custom or usage (i.e., constructive knowledge) before the custom or usage will be applied as the presumptively intended contractual term. *See, e.g., B.P. Apparel, Inc. v. Hunt*, No. 97-4095, 1999 WL 551892, *5 (E.D. Pa. June 16, 1999) ("In attempting to base a contract term or provision upon an industry custom or practice, the [moving party] has the burden of providing evidence that clearly establishes either that the other party has actual knowledge of the custom or that the custom or practice is so notorious, well established, and reasonable that the other party should have such knowledge.") (citing *Jacobson v. Leonard*, 406 F. Supp. 515, 520-21 (E.D. Pa.

1976) and *Leslie v. Pennco*, 470 A.2d 110, 113-14 (Pa. Super. Ct. 1983)); *see also* Restatement (Second) of Contracts § 220, Comment b (1981) ("[A] party who asserts a meaning based on usage must show either that the other party knew of the usage or that the other party had reason to know of it."); 12 Williston on Contracts § 34:16 (4th ed.) ("At common law, there is no general presumption that the usages of a particular trade or business are known to those not in that trade or business.[ ] ... Consequently, proof of actual knowledge on the part of one outside the trade or business is necessary,[ ] unless it has such notice of the custom or usage that the other party reasonably believes the custom or usage is known.[ ]") (internal footnotes and citations to authority omitted); *accord Holiday Homes of St. John, Inc. v. Lockhart*, 678 F.2d 1176, 1185 n.8 (3d Cir. 1982) (citing the rule: "if A ... used or understood the words in a particular sense and asserts that B ..., without having actual knowledge, had reason to know A's usage and meaning, the only way to establish such 'reason to know' is to convince the court that a 'reasonable' man in B's position under exactly similar circumstances would in fact have known A's usage and meaning. A's evidence must show the common usage of other men in like circumstances.") (quoting 3 A. Corbin, Contracts § 538, at 73 (1960)).

The parties' constructive knowledge -- or "reason to know" -- of a particular usage may arise from their engagement in a particular industry or from a general notoriety and acceptance of the usage or custom in question. *See Sunbeam Corp.*, 781 A.2d at 1193 ("If words have a special meaning or usage in a particular industry, then members of that industry are presumed to use the words in that special way . . . ."); *Doyle v. Atlantic Refining Co.*, 53 A.2d 68, 70-71 (Pa. 1947) (plaintiffs who asserted an industry custom had to establish "a custom that was certain, reasonable, distinct, uncontradicted, continued, and so notorious as to be probably known to all parties"); *Leslie v. Pennco, Inc.*, 470 A.2d 110, 113 (Pa. Super. Ct. 1984) ("Evidence of an

industry custom or usage which is notorious, well-established and reasonable is always a relevant consideration in determining the intent of the contracting parties*."); Lancaster Transportation Co. v. New York & New Brunswick Auto Express Co., Inc.*, 146 A.2d 150, 151 (Pa. Super. Ct. 1958) (A custom proven to be certain, continuous, uniform, notorious and reasonable must be presumed to have been known and acted upon by the parties . . . ."); Restatement (Second of Contracts) § 222(1) (defining "Usage of Trade" as "a usage having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to a particular agreement . . . ."); *accord* 13 Pa. Stat. and Cons. Stat. Ann. §1303 (West) (defining "usage of trade" as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question").

As noted, issues pertaining to the existence and scope of customs and usages are factual questions for the jury to decide. *See Trustees of Univ. of Pa.*, 982 F. Supp. 2d at 538 (summary judgment denied where the evidence gave rise to a question of fact as to what the trade usage was and whether it affected the parties' understanding of the contractual terms); *Simon Wrecking Co., Inc. v. AIU Ins. Co.*, 530 F. Supp. 2d 706, 715 (E.D. Pa. 2008) ("Whether a custom or trade usage exists is ordinarily a question for the jury.") (citing *Albus v. Toomey*, 116 A. 917, 918 (Pa. 1922)); *Lancaster Transportation Co.*, 146 A.2d at 152 (whether the rights and liabilities of the parties under the circumstances was controlled by industry custom was a factual question for the jury).

In this case, Defendants have presented evidence sufficient to support a genuine issue of fact as to whether the parties contracted with reference to the industry customs referenced in Ms. McManus' report. If a jury decides that the parties intended the "title examination" clause in the

drafts to function as a condition precedent to contract formation, with "no liability" for nonpayment, that construction would support Defendants' argument that the lease agreements were not binding contracts. For this reason alone, Plaintiffs' motions for summary judgment must be denied.

At the same time, however, the Court cannot determine as a matter of law that the alleged custom of treating "title examination" and "no liability" clauses in this manner were so well-established, notorious and reasonable as to presumptively supply the terms of the contracts in this case. Instead, those inherently factual assessments must be made by the jury. An additional consideration that may impact the jury's determination concerning constructive notice is the fact that some of the remaining Plaintiffs were represented by attorneys when they signed their leases. And if the Defendants' evidence regarding the custom and usage of draft instruments is not accepted as supplying the contractual terms, the Transactional Documents can reasonably be interpreted as evidencing an intent by SWEPI and the Plaintiffs to be contractually bound by the lease terms, as discussed above. Moreover, the Court previously determined in both the *Walney* class action and in this case that the title examination clause in the drafts could reasonably be viewed as creating a condition pertaining to SWEPI's duty of performance rather than the formation of the contract. *See* ECF No. 86 at 17-22; *Walney*, 311 F. Supp. 3d at 724-25.

For these reasons, there remains a genuinely disputed issue of fact concerning the parties' intent to be bound by the lease agreements, so the Court cannot grant Defendants' motion for summary judgment on that basis.

## 2. Was There a Failure of Consideration?

Defendants next contend that the lease agreements are unenforceable because there was a failure of consideration. To that end, Defendants have presented documentary evidence showing

that some type of encumbrance existed as to each of the parcels and/or oil and gas estates in question. ECF No. 328, ¶¶50-535 and ECF No. 327 at 12-14. Defendants posit that the consideration to be provided by Plaintiffs was clear and marketable title to their mineral rights, and the consideration to be provided by SWEPI was the payment of the draft amounts after a full and complete title examination to confirm that clean title existed. Because each lease interest was encumbered, Defendants argue, the exchange of consideration did not occur.

Under Pennsylvania law, a "failure" of consideration "'occurs when the consideration bargained for does not pass, in whole or in part, to the promisor.'" *Victaulic Co. v. HiTherm, LLC*, No. CV 21-5077, 2024 WL 1468820, at *5 (E.D. Pa. Apr. 4, 2024) (quoting *McGuire v. Schneider, Inc.*, 534 A.2d 115, 118 (Pa. Super. Ct. 1987), *aff'd*, 548 A.2d 1223 (Pa. 1988)). "[T]he defense of failure of consideration 'does not contradict the terms of the instrument, but shows that the consideration contemplated was never received.'" *Id.* (quoting *McGuire*, 534 A.2d at 119). A failure of consideration can be partial or complete. *Id.* at *6-7. While a complete failure of consideration excuses the other party's obligation to render further performance under the contract, a partial failure of consideration does not excuse the other party's performance. *Maritz Inc. v. Holy Redeemer Hosp. & Med. Ctr., Inc.*, 1993 WL 460796, at *3 (E.D. Pa. Nov. 3, 1993). Instead, a partial failure of consideration "is merely ground for abatement of damages unless it goes to the root of the contract." *Id.* (cleaned up).

Here, Defendants are essentially arguing a complete failure of consideration based on the encumbrances that existed at the time of the Plaintiffs' leasing arrangements. To support their argument, they rely on the expert report of Ms. McManus. ECF No. 329-2. However, the Court does not read the McManus report as supporting Defendants' broad assertion that every Plaintiff promised to convey marketable title.

Relevantly, Ms. McManus opines that the "lessor's primary obligation under an oil and gas lease is to convey to the lessee the hydrocarbons and the ability to access them." ECF No. 329-2 at 12. She acknowledges that "[f]ailure of title can have enormous financial consequences" for the lessee, because deficiencies "may prevent the development of the oil and gas estate, divest the lessee of its rights in the oil and gas estate, or significantly diminish the ability of the lessee to develop the tract[.]" *Id.* However, Ms. McManus also acknowledges that not every encumbrance defeats the purpose of hydrocarbon exploration and development. On the contrary, she states that "most operators do not require the lessor's title to be perfect in normal leasing situations," but

> where deficiencies are discovered that would create a reasonable doubt affecting the property's value or pose an unreasonable risk of litigation, operators will generally void the lease prior to its becoming operative by not paying the lease "bonus", unless other business considerations indicate a reason to affirm the leasing arrangement, accept the lease and risks inherent with the defect, and pay the lease bonus". In some cases, a lessee will attempt to "cure" deficiencies that appear of record and affirm the lease; however, the lessee is not required to engage in curative actions if deficiencies appear of record that would render the title unmarketable. If title deficiencies appear and no reason exists to accept a business risk in waiving the deficiencies, the lessee generally records a surrender and declines to pay the "bonus".

*Id.* at 15.

Ms. McManus implies that it is industry custom for the *lessee* to assume responsibility for ensuring marketable title. ECF No. 329-2 at 12. She states that the "*lessee* must confirm that no party other than the lessor can claim ownership of the oil and gas rights being leased." *Id.* (emphasis supplied). To that end, "the lessee must obtain a full title examination to discover existing deficiencies and evaluate the risk of loss when they are discovered." *Id.* Additionally, "the lessee must obtain assurance that the person from whom it is acquiring the lease has the power and authority to grant the rights therein." *Id.*

That is precisely what occurred here, inasmuch as SWEPI expressly reserved a period "for title examination and for payment" in each draft and included a general warranty provision in the form lease. [5] *See* Lease Agreement ¶16 ("Lessor hereby generally warrants and agrees to defend the title to the leased premises. . . ."). But a general warranty is not a warranty against all encumbrances. "By the covenant of warranty, the grantor promises to compensate the grantee for any monetary losses occasioned by the grantor's failure to convey the title promised in the deed," *Juniata Valley Bank v. Martin Oil Co.*, 736 A.2d 650, 661 n. 7 (Pa. Super. Ct. 1999), a situation that does not pertain here.[6]

---

[5] Defendants contend in their reply brief that this Court previously rejected the argument that the leases only conveyed a general warranty. ECF No. 450 at 4 (citing Mem. Op. dated March 31, 2022, ECF No. 86, at 13). This assertion is inaccurate. In fact, the Court expressly deferred ruling on Plaintiffs' claim that they had conveyed only a general warranty in the form leases. *See* ECF No. 86 at 21 n.5. Further, the Court rejected Defendants' argument that common law necessarily imposed on Plaintiffs the burden of establishing marketable title, since the rights and obligations of the parties had to be determined by reference to the lease terms. *Id.* at 21. This discussion occurred in the context of a dispute about which party would bear the ultimate burden of proof relative to title. Assuming -- only for the sake of argument -- that Defendants were correct in claiming that Plaintiffs had affirmatively covenanted marketable title, the Court noted that title defects might be viewed as a matter of consideration, as to which Defendants would bear the burden of proof. However, the Court made no definitive ruling on the matter at that time, and the Court finds nothing in its prior memorandum opinion that presently contradicts its observations about the warranties included in the subject leases, or their impact on the issue of consideration.

[6] Defendants contend that a mere cloud on title is sufficient to establish a constructive eviction of an oil and gas lease and breach of a lease's general warranty provision. In support of this rule, they cite *Derrickham Co. v. Brown*, 451 A.2d 477 (Pa. Super. Ct. 1982). Based on the circumstances of that case, the Pennsylvania Superior Court in *Derrickham* agreed with the trial court's determination that a cloud on the lessor's title relieved the lessee of any affirmative duty it may have had, during the pendency of a quiet title action, to drill for oil or make ongoing rental payments. Further, based on the express terms of the lease, the Superior Court rejected the argument that the cloud on title suspended the running of the lease term during the pendency of the litigation. 451 A.2d at 479-80. It does not appear that *Derrickham* has been widely cited in this Commonwealth for the proposition that a cloud on the lessor's title constitutes a breach of a general warranty clause in an oil and gas lease. *C.f.* 4 Kuntz, Law of Oil and Gas §52.2 ("It has been said that an eviction or its equivalent is required for a breach of the covenant of warranty and that the presence of a cloud on the title does not constitute a breach.") (citing cases). Even if a cloud on title could be considered a constructive eviction, however, the remedy that SWEPI bargained for was the lessor's defense of title and/or compensation for any monetary losses occasioned by the lessor's failure to convey clean title. *See* Lease at ¶16; *Juniata Valley Bank*, 736 A.2d at 661 n.7. That situation does not pertain here. Accordingly, in the absence of more broadly recognized authority on the point, this Court is not prepared to predict that the Pennsylvania Supreme Court would adopt the rule of *Derrickham* as it pertains to Defendants' arguments concerning the failure of consideration in this case.

Moreover, some twenty-four (24) Plaintiffs [7] in this case signed overriding lease addenda with even more narrow warranty provisions, which state that "Lessor warrants title to said property only in respects that the title is good to the best of Lessor's knowledge and Lessee agrees that no claims will be made against Lessor pertaining to warranty of title." *See, e.g.*, ECF No. 331-2 at 8, ¶22; see generally ECF No. 443 at 12.  And in the case of Rogers Holdings, the title waiver provision states that "Lessor makes no warranty or representation whatsoever with regard to title or rights to the leased premises or the oil and gas or other constituents subject to this lease.  Lessee acknowledges by acceptance of this lease that it has conducted sufficient investigation to satisfy itself as to title and oil and gas rights associated with the leased premises and Lessee assumes all risk and title failures without any recourse against Lessor."  ECF No. 394-2 at 12, ¶5; id. at 14, ¶7.

In sum, Defendants insist that all Plaintiffs promised marketable title to SWEPI; however, the Court finds no support for that proposition, either in Ms. McManus' report or in the lease documents themselves.  Thus, Defendants have not established, as a matter of law, that the leases are unenforceable due to a failure of consideration.[8]  And because the Transactional

---

[7] These include Plaintiffs: Jenine A. Anthony; Sumner R. and Georgene Bemis; Ronald and Judy Bickel; Clayton L. and Connie L. Blauser; Warren Capenos (through executor Kathleen Barrett); Barrett N. Clark and Marcia L. Gordon; John L. and Dianna J. Erwin; Robert Evans; Robert E. and Pamela J. Exley; Alfred L. and Robyn D. Freeman; Florence R. Geibel; Martin C. Geibel; Clarence R. & Janice R. Guillinger; Malcom L. and Sandy J. Guiste; Michael P. and Beth A. Hutchinson; Larry E. and Pamela J. Keverline; Karen Latshaw; David J. McCune, III and Lauren E. McCune; Tracy L. Miliara; Marc J. Rasschaert; Carol Spellman Seltz (as Executor of the Estate of Harry J. Spellman and Helen M. Spellman); Thomas J. Smerkar (through Executor Angela D. Books); John P. and Barbara A. Yakimick; and Richard Zink.

[8] Defendants filed a separate motion for summary judgment directed against Plaintiff the Estate of Warren Capenos, Clarence R. and Janice R. Guilinger, Michael P. and Beth A. Hutchinson, and John P. and Barbara A. Yakimick, based on the assertion that these Plaintiffs lacked clear title at the time of the purported conveyances. ECF No. 322. Each one of these Plaintiffs had lease addenda with the provision clarifying that they were warranting title only to the best of their knowledge and that SWEPI was waiving any recourse against them related to warranty of title issues.  Based on these provisions, the Court rejects Defendants' argument that the leases are unenforceable due to a failure of consideration.

Documents can be reasonably viewed as evidencing the Plaintiffs' conveyance of an oil and gas interest in return for a binding (albeit conditional) promise on the part of SWEPI to pay the bonus amounts,[9] the Court finds that the element of consideration is satisfied.

### D. Have Plaintiffs Established a Contractual Breach?

Assuming that the lease agreements are enforceable contracts, the Court must next address whether Plaintiffs can adduce evidence of a contractual breach. Plaintiffs posit that a breach occurred when they did not receive immediate payment upon providing their signed leases. Defendants assert that, for several reasons, any contractual obligation they had to fund the draft instruments was excused. We address each point in turn.

#### 1. Plaintiffs' Theory of Contractual Breach

Plaintiffs' motions for summary judgment are predicated on the theory that only the leases and the lease addenda comprised the contractual documents and, under the terms of these documents, Plaintiffs were entitled to receive an immediate monetary payment in exchange for their signed leases. They refer to the language in the Paragraph 1 of the lease forms, which state that the Plaintiffs were conferring leasing rights "[i]n consideration of the bonus consideration paid, the receipt of which is hereby acknowledged[.]" In Plaintiffs' view, SWEPI breached the lease agreements when SWEPI failed to pay the bonus amounts at or before the time that the signed lease documents were given to SWEPI's agents. Plaintiffs contend that any issues relating to deficiency of title, including encumbrances, were waived upon SWEPI's physical

---

[9] The Court so found in the *Walney* class action. *See* 311 F. Supp. 3d at 710 (stating that the Transactional Documents could reasonably be viewed as "provid[ing] valid consideration to each class member in the form of a conditional promise of future payment"); *id.* at 720 (court concluding that "the Transactional Documents evidence a binding promise on the part of SWEPI to pay the Drafts in accordance with the time period specified in each Draft, subject only to SWEPI's verification of clean title within that time frame."). As explained further herein, the Court concurs with this view.

acceptance of the leases.  Citing *Medusa Portland Cement Co. v. Lamantina*, 44 A.2d 244, 246 (Pa. 1945), Plaintiffs contend that the leases became binding, and title passed to SWEPI, immediately upon the execution and delivery of the instruments to SWEPI's agents.

The Court rejects this theory as untenable based on the lease documents and the record as a whole.  As an initial point, Plaintiffs' theory is at odds with the Court's determination both here and in the *Walney* class action that the drafts comprise a part of the putative contractual agreement.  Unlike Plaintiffs, the Court does not believe that the draft provisions can reasonably be eliminated as contractual terms.  Secondly, while the Court recognizes that oil and gas leases involve the conveyance of a property interest, an oil and gas lease is in the nature of a contract under Pennsylvania law, and the contractual terms are therefore paramount.  *Shedden v. Anadarko E. & P. Co., L.P.,* 136 A.3d 485, 490 (Pa. 2016); *In re Powell*, No. 3:13-CV-35, 2015 WL 6964549, at *6 (M.D. Pa. Nov. 10, 2015).  The undersigned finds, as did the Court in the *Walney* class action, that "bonus consideration paid" most logically refers to SWEPI's contemporaneous conferment of the draft, which expressly stated that, "when paid," it would constitute "payment in full" for the associated lease.  311 F. Supp. 3d at 710.  Third, Plaintiffs' proposed interpretation does not comport with the "known characteristics of the particularized nature of the oil and gas industry," *Camp Ne'er Too Late*, 185 F. Supp. 3d at 544, in which oil and gas developers rely on title examinations as a foundation for evaluating complex and costly investment decisions.  *See* McManus Report, ECF No. 329-2 at 12-15; Haney Decl., ECF No. 329-1 at 8-9.  Finally, a resort to the relevant extrinsic evidence confirms the parties' understanding that SWEPI was reserving its right to examine title and could refuse payment based on the results of its examination.  Among other things, the record shows that each lessor

received an instruction letter confirming that the "draft allows 90[10] banking days for title examination and the transfer of funds to your bank." *See, e.g.*, 331-2 at 13. For these reasons, the Court finds Plaintiffs' proposed interpretation of the contractual documents and theory of the contractual breach to be untenable.

On the other hand, the Court finds that the Transactional Documents can reasonably be viewed as evidencing a binding, yet conditional, promise on the part of SWEPI to pay the bonus amounts in exchange for the signed leases. The Court expounded at length on this theory in the *Walney* class action. See 311 F. Supp. 3d at 709-25. In its March 31, 2022 Memorandum Opinion, this Court acknowledged that it could not definitively opine on the meaning and effect of the draft language or the enforceability of the leases, given issues of fact pertaining to industry usage and custom. ECF No. 86 at 17. However, the Court noted it was inclined to view the "title examination" clause as Judge Conti did, "evidencing a promise by SWEPI 'to pay the bonus amounts by the end of the time period specified in the Draft, unless it determined within that time that the lessors lacked sufficiently clean title to the underlying gas and oil interests.'" *Id.* (citing 311 F. Supp. 3d at 710). The Court went on to clarify that SWEPI bore the burden of establishing title defects. *Id.* at 18-20. Consequently, Plaintiffs could demonstrate a *prima facie* contractual breach by demonstrating either that (1) SWEPI had repudiated the leases outside of the time frame permitted by the draft; or that (2) SWEPI had repudiated the lease for reasons unrelated to defective title. Id. at 20. Upon consideration of all arguments raised in the latest summary judgment filings, the undersigned remains of the view that this is a reasonable interpretation of the Transactional Documents.

---

[10] Some Plaintiffs received drafts with a shorter time period for title examination and payment, as with the following individuals: Robert Evans (30 days); Robert and Pamela Exley (30 Days); Robert Shaffer (30 days); Clarence and Janice Guilliger (45 and 60 days respectively), John and Barbara Yakimick (60 days). For present purposes, however, these discrepancies are immaterial.

Plaintiffs argue, however, that they have demonstrated a contractual breach with respect to nearly all of the subject leases because, in their view, only five of SWEPI's notices of cancellation were timely.  Plaintiffs submit that SWEPI was obligated to communicate its intent to cancel the leases "clearly and unambiguously," ECF No. 443 at 17 (citing Dougherty v. TEVA Pharms. USA, 2008 U.S. Dist. LEXIS 13255, *25 (E.D. Pa 2008)), and they assert that SWEPI's earliest notice occurred with the transmission of its cancellation letters.  *Id.*  Plaintiffs go on to argue that, in all but five instances, the date of the cancellation letter was too late, because it occurred outside of the timeframe established in the drafts.

This argument is unavailing in that the Court previously determined that SWEPI could effectively reject the leases by cancelling the drafts within the time frames stated thereon.  *See* ECF No. 86 at 22-23.  The record establishes that all drafts were cancelled within the time frames stated on the instruments, and Plaintiffs do not contend otherwise.  Accordingly, whether SWEPI timely rejected the Plaintiffs' leases is not a genuinely disputed issue of fact.

Having thus addressed Plaintiffs' theory regarding contractual breach, the Court turns to the Defendants' arguments.

2.  Defendants' Theory That Any Obligation to Pay the Drafts Was Excused

Assuming, without conceding, that the lease agreements are enforceable, Defendants posit several reasons why any obligation that SWEPI had to fund the drafts was excused.  We consider each argument in turn.

(i)    FAILURE TO PRESENT THE DRAFTS

Defendants first assert that summary judgment is warranted as to four Plaintiffs who did not present their drafts to their banks.  Defendants explain that the period for title examination and payment was triggered only when a lessor presented their draft, as signed by them on the

36

back, to Amegy Bank for payment. The Court agrees that, pursuant to the express terms of the draft, the time period for title examination and payment commenced upon Amegy Bank's receipt of the signed instrument from Plaintiffs' "forwarding" banks. For any Plaintiff who never presented their draft to their own bank, the drafts were never forwarded to Amegy Bank, and the designated period for payment never commenced. Consequently, no payment due date could ever have arrived, and SWEPI could not have breached a payment obligation. *See Walney*, 311 F. Supp. 3d at 730. Defendants assert that this is the case for Clayton L. and Connie L. Blauser (the "Blausers"), Malcom and Sandy Guiste (the "Guistes"), Rogers Holdings, and Richard Zink.

*The Blausers*

Defendants submitted evidence that the Blausers never presented their draft to Amegy Bank through their own forwarding bank or otherwise. *See* ECF No. 328, ¶¶122-26; ECF No. 329-8. The Blausers testified to that effect, and SWEPI also points to a letter from Amegy Bank indicating that it could not locate specific drafts, including drafts for "Clayton L and Connie L." ECF No. 329-1 at 505. Plaintiffs attempted to counter this evidence by asserting that the submission of the Blausers' draft is shown "by copies of the Collection Letter activity between [their] bank and Amegy Bank, whereby the Draft is shown to have been received by SWEPI's bank [Appx 9]." ECF No. 443. However, the documentation submitted by Plaintiffs pertains to, and bears the signature of, Leroy E. and Elizabeth M. Blauser, not Clayton L. and Connie L. Blauser. No explanation is given for this discrepancy. Because Plaintiffs have not shown the existence of a genuinely disputed fact concerning the failure of Clayton and Connie Blauser to present their draft for payment, Defendants are entitled to summary judgment on the Blausers' claim.

37

*The Guistes*

Defendants adduced evidence that the Guistes never presented their draft to Amegy Bank through their own forwarding bank or otherwise. See ECF No. 328, ¶¶287-90 and n.1; ECF No. 329-18. Plaintiffs purported to counter this issue by pointing to a record obtained from SWEPI during discovery that supposedly showed a bank due date for the Guistes' draft. See ECF No. 443 at 17; ECF No. 444-10. The document does not bear any indication of the Guistes' name, however, and does not give rise to a genuinely disputed issue of material fact. Accordingly, Defendants are entitled to summary judgment on the Guistes' claim.

*Rodgers Holdings*

In their Concise Statement of Material Facts, ECF No, 328, Defendants asserted the following facts concerning Rodgers Holdings. On January 30, 2012 Rodgers Holdings purported to lease the oil and gas rights in three parcels to SWEPI and received three drafts in connection with these transactions. *See* ECF No. 328, ¶¶ 416-17; *see* ECF No. 329-27. Rodgers Holdings is a purported Pennsylvania partnership, and not all of the partners signed the documentation to lease the subject oil and gas rights to SWEPI. *Id.*, ¶418. The three drafts given to Rodgers Holdings were returned on June 11, 2012, one day before their due date, with a notation that those drafts were to be replaced with new drafts. *Id.*, ¶419. Rodgers Holdings was informed that it needed to sign additional paperwork in order to get the replacement drafts, but it did not do so after one of the partners passed away. *Id.*, ¶420. Rodgers Holdings never signed the Unanimous Written Consent of the Partners that SWEPI had presented to it. *Id.*, ¶421. Rodgers Holdings' replacement Drafts were never presented to Amegy Bank for payment. Id., ¶423.

Plaintiffs did not file a responsive statement but asserted in their brief that "Rodgers Holdings evidences its submission of its Drafts by copies of the Collection Letter activity

between its bank and Amegy Bank." ECF No. 443 at 17 (citing to Pls' Appendix 11 at ECF No. 444-11). The referenced documents appear to be the original drafts that had been issued to Rodgers Holdings. They bear the notation that they were being returned because they were to be replaced by new drafts. Nothing in Plaintiffs' response indicates that there is a genuinely disputed issue concerning the failure of Rodgers Holdings to present operable drafts to Amegy Bank. Accordingly, Defendants are entitled to summary judgment on the claims asserted by Rodgers Holdings.

*Richard Zink*

Defendants assert that Plaintiff Richard Zink was issued a draft in connection with his lease which was returned and replaced with a second draft that provided SWEPI an additional 60 days for title review. See EF No. 328, ¶¶520-22; ECF No. 329-33. It is this second draft that Defendants claim was never presented to Amegy, precluding the commencement of SWEPI's time frame for title examination and payment. But Defendants' own exhibits show that Mr. Zink denied being consulted about an extension of time and also denied ever being offered a replacement draft or receiving one. Id. While SWEPI's exhibits include a copy of the replacement draft, it is unsigned. See ECF No. 328, ¶¶52e; ECF No. 329-33 at 6. The Court cannot say on the basis of this evidence that no genuine dispute exists concerning the question of whether Mr. Zink received a replacement draft and failed to forward such draft to Amegy. Accordingly, the Court will not grant Defendants' motion for summary judgment as it pertains to Mr. Zink's claim.

(ii)    TITLE AS A CONDITION OF PERFORMANCE

Defendants next contend that SWEPI's obligation to fund the drafts was excused because it was expressly conditioned on SWEPI's ability to verify clean and marketable title, and this

condition did not occur.  Defendants conclude that, "[i]f SWEPI could not complete its titles search, or if SWEPI was able to conduct a title search and found that title was unclean, then in both instances its obligation to pay was never triggered and was excused."  ECF No. 327 at 21.

      This argument blurs an important distinction that this Court previously drew in its March 31, 2022 ruling.  Whereas "SWEPI interprets the [title examination] clause to mean that it would not fund the drafts unless it could first verify, within the agreed upon number of banking days, that the lessor had clean title to the property interest being conveyed," 2022 WL 976806, at *9, this Court interpreted the clause as meaning that "SWEPI promised to fund the drafts upon expiration of the specified number of banking days, *unless* it rescinded the lease in the interim because of unclean title." Id. (emphasis in the original).  The distinction, though subtle, places the risk of an incomplete title examination on SWEPI rather than the Plaintiffs, which is consistent with the fact that: (a) SWEPI issued the draft with the title examination clause, (b) SWEPI had a business interest in completing the title examination process, and (c) SWEPI was the party in control of the title examination process.  Thus, the Court rejects SWEPI's proposed interpretation of the lease terms whereby Plaintiffs must prove that SWEPI successfully completed its title examination and verified clean and marketable title as a condition to receiving payment.

      Defendants next assert that, "[a]s to each and every Plaintiff for which SWEPI was able to complete a title examination within the allotted time period provided for in the Draft, SWEPI surrendered the lease for title related issues."  ECF No. 327 at 25.  Defendants do not delineate individual cases in their brief but instead refer generally to their concise statement of material facts, which provides factual detail pertaining to each disputed transaction.

The Court has reviewed Defendants' concise statement in detail and makes the following observations. First, Defendants assert in their concise statement of facts that, "where SWEPI surrendered leases and cancelled drafts, it kept meticulous records of the reason the lease was surrendered and the draft cancelled." ECF No. 328, ¶13. Second, based on the declaration of Ian Haney, Defendants assert that certain remarks appearing on each draft indicate the reason the draft was returned unpaid.

For example, Defendants assert that "[t]he return reason of 'Title Failure' covered a variety of title problems that would be an impediment to SWEPI obtaining clean title to the oil and gas interest that is the subject of the lease." ECF No. 328, ¶15 (citing Declaration of Ian Haney at ¶ 19). Similarly, "[t]he return reason of 'Cancelled per Land Department Directive' indicated that title issues had been identified during the course of a title search." ECF No. 328, ¶17 (citing Declaration of Ian Haney at ¶ 22). The foregoing remarks appear on drafts issued to Plaintiffs Gage Allam (through Executor Stephen Warner, ECF No. 328 at ¶52, ECF No. 329-4); Ronald and Judy Bickel (ECF No. 328 at ¶110, ECF No. 329-7), Alma Lee Britt (ECF No. 328 at ¶157, ECF No. 329-10); Barrett Clark and Marcia Gordon (ECF No. 328 at ¶189, ECF No. 329-12), Alfred and Robyn Freeman (ECF No. 328 at ¶246, ECF No. 329-16), Michael and Beth Hutchinson (ECF No. 328 at ¶310, ECF No. 329-19), Stephen and Barbara Lewis (ECF No. 328 at ¶363, ECF No. 329-23), Marc Rasschaert (ECF No. 328 at ¶407, ECF No. 329-26), Carol Spellman Seltz (Executor of the Estate of Harry and Helen Spellman, ECF No. 328 at ¶474, ECF No. 329-30), and John and Evelyn Stewart (ECF No. 328 at ¶487, ECF No. 329-31).

As to Plaintiffs Bickel, Britt, and Spellman Seltz, the Court perceives no genuinely disputed issue of fact concerning Defendants' assertion that, for reasons related to title deficiencies, the Plaintiffs' leases were rejected and the drafts cancelled prior to the deadlines

41

stated in the drafts. Accordingly, Plaintiffs cannot demonstrate a breach of these lease agreements, even assuming they are enforceable contracts. Defendants' motion for summary judgment will be granted as to these Plaintiffs.

The Court reaches a different conclusion with respect to Plaintiffs Allam, Clark/Gordon, Freeman, Hutchinson, Stephen and Barbara Lewis, Rasschaert, and Stewart. As to these Plaintiffs, the record shows that SWEPI sent cancellation letters advising that the leases were being surrendered, and the title examination process abandoned, "[d]ue to difficulties arising from restrictions placed upon Southeast Land Services at the Venango County Courthouse . . . [c]oupled with a depressed natural gas price environment[.]" *See* ECF No. 444-6 at 1, 12, 17, 19, and 22; *see also* ECF No. 424 at ¶11, ECF No. 428 at ¶11. The Court finds that this conflicting evidence is sufficient to create a genuinely disputed issue of material fact as to whether SWEPI breached the leases by surrendering them for reasons unrelated to its discovery of defective title.

Defendants also assert in their concise statement of material fact that "[t]he return reasons of 'Venango County- Title Not Complete' and 'Venango County- Reprioritization No Redraft' indicated either a title issue had been identified and/or the inability to verify title due to the courthouse restricting access to records." ECF No. 328, ¶16 (citing Declaration of Ian Haney at ¶20). This occurred with the drafts issued to Plaintiffs Jenine Anthony (ECF No. 328 at ¶69, ECF No. 329-5), Dennis and Angela Boocks (ECF No. 328 at ¶144, ECF No. 329-9), Warren Capenos (through executor Kathleen Barrett, ECF No. 328 at ¶173, ECF No. 329-11), Robert Evans (ECF No. 328 at ¶218, ECF No. 329-14), Florence Geibel (ECF No. 328 at ¶73, ECF No. 329-5), Martin Geibel (ECF No. 328 at ¶77, ECF No. 329-5), Clarence and Janice Guillinger (ECF No. 328 at ¶¶265 and 272, ECF No. 329-17), Larry and Pamela Keverline (ECF No. 328 at

¶324, ECF No. 329-20), Karen Latshaw (ECF No. 328 at ¶338, ECF No. 329-21), Scott Michael

Lewis (ECF No. 328 at ¶351, ECF No. 329-22), David J. McCune, III and Lauren McCune (ECF

No. 328 at ¶374, ECF No. 329-24), Tracy Miliara (ECF No. 328 at ¶390, ECF No. 329-25),

Robert Shaffer (ECF No. 328 at ¶443, ECF No. 329-28), Thomas Smerker (ECF No. 328 at

¶461, ECF No. 329-29), and John and Barbara Yakimick (ECF No. 328 at ¶502 (ECF No. 329-

32).

　　　　As to this group of Plaintiffs, Defendants are equivocal about the reason for the draft

cancellations and lease surrenders.  Based on the current record, the Court cannot definitive

determine whether the cancellations were due to a title defect that had been positively identified

or simply the inability of SWEPI's agents to complete the title examination process.  While the

former circumstance would excuse SWEPI's payment obligation, the latter would not (as we

discuss further, *infra*).  Thus, Defendants have not demonstrated the absence of a genuine

material facts relating to the alleged breach of those leases.

　　　　Defendants also make the fallback argument that, regardless of the reason SWEPI may

have articulated for its lease surrenders, SWEPI was well within its rights to refuse payment

because discovery has revealed an encumbrance on each remaining oil and gas interest at issue.

Under general contract principles, a party's duty to perform is excused if the other party to the

contract has committed a material breach. *Pheasant Ridge Dev. Corp. v. Fulton Fin. Corp.*, No.

2356 EDA 2023, 2025 WL 1013370, at *11 (Pa. Super. Ct. 2025) (citing *McCausland v.

Wagner*, 78 A.3d 1093, 1101 (Pa. Super. Ct. 2013)).  But for the reasons previously discussed,

the general warranties in the form leases provided only promises to indemnify and defend

SWEPI against losses that might be occasioned by the lessor's failure to convey clean title,

circumstances which did not occur in this case. *See* ECF No. 331-2 at 4, Lease ¶16. *see also*

*Juniata Valley Bank*, 736 A.2d at 661 n.7.  Accordingly, the Court will not grant Defendants'

motion for summary judgment on the basis that Plaintiffs materially breached their lease

agreements.

(iii)    THE "NO LIABILITY" CLAUSES IN THE DRAFTS

Defendants next argue that any payment obligation they may have had was excused

based on the "no liability" language in the drafts.  Pointing to the McManus report, Defendants

posit that the "no liability" clause meant that no liability would attach to any party if the drafts

were not paid.  Defendants conclude that, "[e]ffectively, SWEPI was entitled to terminate the

lease agreements with Plaintiffs for any reason and refuse to consummate the transaction."  ECF

No. 327 at 26.

As discussed, the customs and usage evidence upon which Defendants rely involves

triable issues for the jury.  Accordingly, the Court will not grant Defendants' motion for

summary judgment on this basis.

(iv)    SWEPI'S INABILITY TO COMPLETE ITS TITLE SEARCHES

Defendants also contend that SWEPI's obligation, if any, to fund the drafts was excused

as to numerous Plaintiffs whose title examinations could not be completed within the time frame

indicated on the draft, due to congestion at the Venango County Courthouse.[11]  Defendants argue

---

[11] According to Defendants, SWEPI kept "meticulous" records of the reason why the lease were surrendered and the
drafts cancelled. ECF No. 328, ¶13.  The return reasons of "Venango County-Title Not Complete" and "Venango
County- Reprioritization No Redraft" were indicative of SWEPI's inability to complete its title search within the
allotted number of banking days.  See ECF No. 327 at 27; ECF No. 328, ¶16.

Defendants represent that

> [t]he following is a list of those Plaintiffs for whom SWEPI was unable to timely complete a title
> search due to the extraneous circumstances at the Venango County Courthouse: Jeanine A. Anthony;
> Rodney S. Bedow, Sr. (Walney case); Ronald and Judy Bickel (both Drafts); Clayton L. and Connie
> L. Blauser; Dennis Ray and Angela D. Boocks; Warren Capenos; Barrent N. Clark and Marcia L.
> Gordon; Robert R. Evans; Florence R. Geibel; Martin C. Geibel; Larry E. and Pamela J. Keverline;

44

that, in those cases, SWEPI's duty of performance was rendered impracticable because it was unable, through no fault of its own, to exercise its right to verify clean title.

Defendants' argument implicates the doctrine of impossibility.[12] "Under Pennsylvania contract law, impossibility of performance 'means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, or loss involved.'" *Leonard v. Sec'y Pennsylvania Dep't of Hum. Servs.*, No. 24-1179, 2024 WL 5182623, at *2 (3d Cir. Dec. 20, 2024) (quoting *West v. Peoples First Nat'l Bank & Trust Co.*, 106 A.2d 427, 432 (Pa. 1954)). "For an agreement to be impracticable, there must be a supervening event the non-occurrence of which was a basic assumption of the parties." *Id.* (citing Restatement (Second) of Contracts § 261, cmt. b (Am. L. Inst. 1981) and *9795 Perry Hwy. Mgmt., LLC v. Bernard*, 273 A.3d 1098, 1104 (Pa. Super. Ct. 2022) (quoting the Restatement (Second) of Contracts § 261)).

---

Scott Michael Lewis; Marc J. Rasschaert; Robert D. Shaffer; Carol Spellman Seltz; and Thomas J. Smerkar. SOF ¶¶ 64-87, 101-119, 120-138, 139- 151, 168-183, 184-197, 213-227, 319-332, 346-357, 402-415, 438-455, 456-468, 469-481.

ECF No. 327 at 27-28.

The Court's review of Defendants' concise statement and supporting evidence suggests that their list contains some discrepancies. Specifically, the Bickels and Carol Spellman Seltz should be excluded from this list, as the evidence shows their drafts were timely cancelled due to title defects. *See* ECF No. 328, ¶110 and ECF No. 329-7 (Bickels); ECF No. 328, ¶474 and ECF No. 329-30 (Spellman Seltz). Also, the Court has previously determined that the Blausers failed to present their draft to Amegy and, consequently, the time for title examination and payment never commenced. *See* ECF No. 328, ¶122-26; ECF No. 329-5.

The evidence also suggests, however, that some additional Plaintiffs may be among those whose drafts were cancelled because of SWEPI's inability to timely complete a title examination in Venango County. These include Clarence and Janice Guillinger (See ECF No. 328, ¶¶265, 272; ECF No. 329-17); Karen Latshaw (ECF No. 328, ¶338; ECF No. 329-21); David McCune, III and Lauren McCune (ECF No. 328, ¶374; ECF No. 329-24); Tracy Miliara (ECF No. 328, ¶390; ECF No. 329-25); and John and Barbara Yakimick (ECF No. 328, ¶502; ECF No. 329-32).

[12] Defendants state in their brief: The Court previously determined that Defendants may viably argue the defense based on the doctrine of impossibility for those Plaintiffs for whom title searches could not be completed due to congestion at the Venango County Courthouse." ECF No. 327 at 27 (citing *Walney v. SWEPI LP*, 1:13-cv-102 (W.D. Pa.) (Mem. Op. dated Mar. 31, 2019, ECF No. 249, at 20-21). In the referenced opinion, which addressed SWEPI's motion to decertify the class, the Court found only that the doctrine remained a potentially viable defense and, because it potentially impacted only a portion of the class, that defense "counsel[ed] against a finding that issues common to the class predominate over individual issues." The Court did not at that time reach any decision concerning the merits of SWEPI's "impossibility" defense.

"Traditionally, the doctrine of impracticability has been applied in three types of cases: (1) cases involving the 'supervening death or incapacity of a person necessary for performance'; (2) cases involving the 'supervening destruction of a specific thing necessary for performance'; and (3) cases involving a 'supervening prohibition or prevention by law.'" *Id.* (quoting Restatement (Second) Contracts §261, cmt. a.). "The question is generally considered to be one of law rather than fact, for the court rather than the jury." Restatement (Second) of Contracts, Introductory Note to Chapter 11, Impracticability of Performance and Frustration of Purpose (1981).

Notably, the form leases include a "Force Majeure" provision addressing circumstances where SWEPI might be "prevented from complying with any expressed or implied covenant" of the lease "as a result of any cause whatsoever beyond the control of [SWEPI]," including an "order or regulation of the government[.]" *See* Lease ¶14. In those situations, the lease provided that "while so prevented, [SWEPI's] obligation to comply with such covenant shall be suspended for so long as compliance is thus prevented and for six (6) months thereafter." *Id.* Neither Plaintiffs nor Defendants have referenced this provision, presumably because they do not view it as pertaining to SWEPI's payment obligation. Assuming the clause *does* apply, there is no evidence that SWEPI attempted to invoke it or otherwise extend the time "for title examination and for payment" relative to the leases at issue. Instead, SWEPI merely terminated its title examinations and cancelled the drafts. A party claiming impracticability "is expected to use reasonable efforts to surmount obstacles to performance . . . , and a performance is impracticable only if it is so in spite of such efforts." Restatement (Second) of Contracts § 261 (1981); *see Prusky v. Reliastar Life Ins. Co.*, 474 F. Supp. 2d 695, 700 (E.D. Pa. 2007). Here, SWEPI waived any right it may have had to extend the time for title examination under the Force Majeure provision.

Assuming that the Force Majeure clause does *not* apply to SWEPI's payment obligations, it is SWEPI who should bear the risks associated with its unsuccessful title searches. Here, the alleged supervening obstacle came in the form of restrictions that county commissioners placed on access to the register and recorder's offices in the Venango County Courthouse. To be clear, these restrictions did not preclude title searching altogether; they merely imposed limitations on the time during which title searchers could access the public records. Under the circumstances here, it is fair to place the risk of loss associated with these events on SWEPI. For one, SWEPI supplied the contractual terms pertaining to title examination and could have included additional language affording itself greater protection against unforeseen impediments. Second, as between lessor and lessee, SWEPI had the stronger interest in obtaining fulsome title searches. Third, SWEPI and its agents controlled the title examination process, both by conducting the actual searches and by deciding how many signed leases to accept. All of these considerations lead the Court to conclude that SWEPI should bear any risk of loss associated with the courthouse restrictions.

The Court also notes, based on SWEPI's cancellation letters, that market forces may have played a role in SWEPI's decision to surrender the Venango County leases. But the continuation of existing market conditions is not ordinarily a "basic assumption" on which a contract is made; thus, "mere market shifts . . . do not usually effect discharge under the rule." Restatement (Second) of Contracts § 261 comment b (1981); *see also Harrison v. Cabot Oil & Gas Corp.*, 110 A.3d 178, 184 (Pa. 2015) (noting that the "speculative nature of oil and gas extraction inherently requires the assumption of large risks" and determining that "such business judgments are commonplace and do not warrant shifting the risk of litigation from multimillion-dollar corporations to small landowners such as [the plaintiff lessor]").

For these reasons, the Court finds that SWEPI's payment obligations were not excused by the restrictions that were placed on title searches at the Venango County Courthouse in April of 2012 or by the general congestion that occurred during times relevant to this lawsuit. The Court will deny Defendants' motion for summary judgment as it relates to this particular defense.

### E. Plaintiffs Who Requested a Surrender of Their Leases

Defendants assert in their concise statement of material fact that Plaintiffs' Sumner and Georgene Bemis, John and Dianna Erwin, and Robert and Pamela Exley requested a surrender of their leases, which SWEPI honored. *See* ECF No. 328 at ¶¶ 92-93, 202-204, and 233-34, ECF Nos. 329-6, 329-13, and 329-15. The evidence indicates that SWEPI cancelled the drafts in each case within the time frames stated on the instruments. *See* ECF No. 328 at ¶¶ 93, 204, 232. Plaintiffs did not dispute the Defendants' assertions concerning the Plaintiffs' requests for the surrender of these leases and, in fact, their own documentation supports Defendants' assertions. *See, e.g.*, ECF Nos. 444-6 at 5, 15, 27.

Under Pennsylvania law, the parties to a contract may agree to rescind the agreement by mutual assent. *See In re Bridgeport Fire Litig.*, 8 A.3d 1270, 1282 (Pa. Super. Ct. 2010) ("[A] contract can be repudiated by mutual agreement of all parties to it.") (citing *Kirk v. Brentwood Manor Homes, Inc.*, 159 A.2d 48 (Pa. Super. Ct. 1960)). A rescission "need not be expressed in words but may be inferred from the parties' acts and declarations[.]" *Johnston v. Johnston*, 499 A.2d 1074, 1077 (Pa. Super. Ct. 1985). Although the rescission of a contract must be supported by consideration, a surrender of mutual rights by the parties generally satisfies this requirement. *See Fedun v. Mike's Cafe, Inc.*, 204 A.2d 776, 781 (Pa. Super. Ct. 1964), *aff'd*, 213 A.2d 638 (Pa. 1965).

Whether or not the parties have agreed to rescind an agreement is typically a factual issue. *See Johnston*, 449 A.2d at 1077 (citing *Kirk*, 159 A.2d at 51). Here, however, there appears to be no genuine dispute concerning the fact that the Bemises, Erwins, and Exleys rescinded their lease agreements with SWEPI by mutual assent. Accordingly, as this issue was not expressly raised in Defendants' motion, the Court will direct Plaintiffs to show cause why summary judgment should not be entered in Defendants' favor relative to the claims of these Plaintiffs.

### F.  Have Plaintiffs Established Recoverable Damages?

Defendants next argue that Plaintiffs' breach of contract claims fail because they are not entitled to the damages they seek through specific performance. They posit that, under Pennsylvania law, a plaintiff cannot "enforce specific performance of a contract in favor of a vendor of real estate unless he is able to offer marketable title which is beyond reasonable uncertainty." ECF No. 327 at 28 (quoting *Swain v. Fidelity Ins., Trust & Safe Deposit Co.*, 54 Pa. 455, 458 (Pa. 1867). The term "marketable title," they say, includes good and "indubitable title" in the property being conveyed. *Id.* (citing *Swayne v. Lyon*, 67 Pa. 436, 439 (Pa. 1871)). Defendants insist that Plaintiff cannot convey clean and marketable title to SWEPI in exchange for specific performance via payment of the draft because each and every Plaintiff had an encumbrance on their title at the time they signed their lease agreement, and those encumbrances still exist. Moreover, several Plaintiffs no longer own the oil and gas rights they purported to lease to SWEPI in or around 2012. Consequently, Defendants argue, Plaintiffs are without a viable remedy and summary judgment should be entered against them.

This Court previously addressed the issue of the proper measure of damages in its March 2022 ruling on certain issues of law. Previously, the Court considered the Pennsylvania Supreme

Court's decision in *Bafile v. Borough of Muncy*, 588 A.2d 462, 464 (Pa. 1991), as it pertained to the three remedies traditionally available to a seller when a buyer defaults under an agreement of sale for real property. As the court recounted in *Bafile*, a nonbreaching seller can "sue a defaulting party for damages, measured as the contract price minus the fair market value at the time of the breach less any payments received," or "request specific performance of the contract," or "commence a contract action for the purchase price of the real property and other damages, conditioned upon the transfer of the property." 588 A.2d at 464. The Court initially adopted this model on the theory that the subject leases were akin to executory contracts for the purchase of real estate. See ECF No 86 at 13-14.

On further reflection, the Court finds this analogy to be problematic, as the putative contracts in this case were "paid up" oil and gas leases. "A paid-up oil-and-gas lease is a contract for mineral rights in which the lessee (i) pays the lessor a lump-sum initial payment in return for the option to extract oil and gas from the land for a set period of time without any commitment to actually do so and (ii) agrees to provide other compensation to the lessor, often in the form of royalties, in return for any oil and gas actually extracted from the land." *Slamon v. Carrizo (Marcellus) L.L.C.*, No. 23-1394, 2024 WL 4602673, at *1 (3d Cir. Oct. 29, 2024); *see also KEM Res., LP v. Deer Park Lumber, Inc.*, 310 A.3d 142, 144 n.1 (Pa. 2024) ("[A] paid-up oil and gas lease is '[a] mineral lease that does not provide for delay-rental payments and does not subject the lessor to any covenant to drill. In effect, the lessor makes all delay-rental payments, and perhaps a bonus, when the lease is signed.'") (quoting Paid-up Lease, Black's Law Dictionary (11th ed. 2019) (second alteration in original)). The contemplated transfers were for a five-year primary term, commencing on the dates the leases were signed. Those five-year periods have now expired.

Under Pennsylvania law, if a party breaches a contract but otherwise substantially performs, the breaching party may still enforce the contract, and the non-breaching party may not suspend performance. *See Pheasant Ridge Dev. Corp. v. Fulton Fin. Corp.*, 339 A.3d 363 (Pa. Super. Ct. 2025). Here, the Plaintiffs substantially performed their obligations by delivering signed lease agreements and MOLs to SWEPI and, therefore, they were entitled to enforce the lease agreements on the terms agreed to. Alternatively, to the extent the principles of *Bafile* apply, the Court agrees with the Plaintiffs' position that the attempted transfers occurred when the signed leases and MOLs were delivered, allowing Plaintiffs to now sue for the full amount of the bonuses.

In arguing that Plaintiffs lack a viable remedy, Defendants largely reassert their argument concerning the alleged failure of consideration. Defendants claim that the only consideration given by the Plaintiffs was their promise to grant title to their oil and gas rights which, according to Defendants, did not occur. Defendants point to the lease language, by which the lessors did "grant, demise, lease and let exclusively" to SWEPI the oil and gas rights associated with their respective properties. They argue that, by statute, these words constituted a promise by Plaintiffs not only of ownership, but also a lack of encumbrances. See ECF No. 327 at 28-29 (citing 21 P.S. §4). And those covenants, Defendants say, were breached upon execution of the lease. Id. at 29 (citing *Juniata Valley Bank v. Martin Oil Co.*, 736 A.2d at 660-61 n. 7).

The Court has previously addressed Defendants' failure-of-consideration argument and will not rehash it here at length. The Court will note, however, that the statutory provision relied upon by Defendants pertains to the conveyance of "land" and states the following:

> The words "grant and convey," or either one of said words, in any deed or instrument in writing for conveying or releasing land hereafter executed, shall be adjudged an express covenant to the grantee, his heirs and assigns; to wit, That the grantor was seized of an indefeasible estate in fee simple in the property conveyed,

>freed from incumbrances done or suffered from the grantor, as also for quiet
>enjoyment against the grantor, his heirs and assigns, *unless limited by express
>words contained in such deed.*

21 Pa. Stat. Ann. § 4 (West) (emphasis supplied).  Here, of course, the form leases contained

only general warranties, by which "the grantor promises to compensate the grantee for any

monetary losses occasioned by the grantor's failure to convey the title promised in the deed,"

*Juniata Valley Bank*, 736 A.2d at 661 n.7, a situation that did not occur here.  And, as previously

noted, certain Plaintiffs had even more limited clauses in their superseding lease addenda,

warranting good title only to the best of their knowledge, and acknowledging SWEPI's waiver of

any right to make an affirmative claim against them.

In sum, the Court finds no merit in Defendants' claim that the Plaintiffs have failed to

establish a basis for recoverable damages in the case of a contractual breach.  Defendants'

motion for summary judgment will therefore be denied as to this issue.

### G.  Have Defendants Shown a Failure to Mitigate?

This Court previously determined that Plaintiffs had a duty to mitigate their damages.

ECF No. 86 at 15.  However, Pennsylvania law treats mitigation of damages as an affirmative

defense for which Defendants have the burden of proof.  *Prusky v. ReliaStar Life Ins. Co.,* 532 F.

3d 252, 258 (3d Cir. 2008).

Here, Defendants seek summary judgment against certain Plaintiffs whom they claim

mitigated their damages in whole or in part.  They also seek summary judgment against certain

Plaintiffs whom they claim failed to take any reasonable steps to mitigate their damages.

To prove a failure to mitigate, Defendants must show: "(1) what reasonable actions the

plaintiff ought to have taken, (2) that those actions would have reduced the damages, and (3) the

amount by which the damages would have been reduced." *Prusky*, 532 F. 3d at 258-59 (citation

omitted). "Damages that could have been 'avoided with reasonable effort without undue risk, expense, burden, or humiliation will be considered ... as not being chargeable against the defendant.'" *Id.* (quoting WILLISTON ON CONTRACTS § 64:27, at 195). In other words, where a party who is damaged by a contractual breach fails to take reasonable steps to mitigate his damages, the "amount recoverable by the damaged party must be reduced by the amount of losses which could have been avoided by the party's reasonable efforts to avoid them." *Turner Constr. Co. v. First Indemn. of Am.* 829 F. Supp. 752, 761 (E.D. Pa. 1993). "Reasonableness 'is to be determined from all the facts and circumstances of each case and must be judged in the light of one viewing the situation at the time the problem was presented.'" *Prusky,* 532 F.3d at 259 (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir.1950)).

(a)

Defendants contend that eight Plaintiffs (Anthony, Britt, the Bickels, Clark/Gordon, the Freemans, the Geibels, Miliara, and Rodgers Holdings, Inc.) should be barred from receiving all or part of their damages because they failed to mitigate their damages despite having a reasonable opportunity to do so. Defendants posit that each of these Plaintiffs admitted they were either affirmatively approached by another company about leasing their oil and gas rights and yet refused to enter into a lease, or they took no steps to re-lease their oil and gas rights despite being aware that other companies in the area were looking to enter into leases. Defendants have presented evidence that certain Plaintiffs who *did* mitigate their damages received between $1,000 to $3,500 per acre.

The Court has reviewed the portion of the record relevant to these particular Plaintiffs. As to Rodgers Holdings, the Court agrees that there is compelling evidence indicating that this Plaintiff failed to take reasonable steps to re-lease its gas and oil interests, which could have

53

resulted in a partial mitigation of its alleged losses. Specifically, the evidence shows that, following the surrender of its leases by SWEPI, Rodgers Holdings was offered $1,000 an acre to lease the oil and gas rights to the same three parcels involved in the SWEPI leases. Rodgers Holdings turned the new offer down, believing that it was too low. ECF No. 320, ¶¶153-154; ECF No. 321-14 at 19-21. Had Rodgers Holdings accepted the offer and re-leased its oil and gas rights, it would have mitigated its alleged damages by $160,400 (i.e., 160.4 acres x $1,000 = $160,400). However, the point is moot in light of the Court's prior determination that Rodgers Holdings never presented operable drafts to SWEPI, thereby excusing any payment obligation that SWEPI might have had under its leases with Rodgers Holdings.

As to the other Plaintiffs that Defendants have identified (*i.e.* Anthony, Britt, the Bickels, Clark/Gordon, the Freemans, the Geibels, and Miliara), the Court finds that the evidence is not so compelling and unequivocal as to justify entry of summary judgment relative to SWEPI's affirmative defense. "Whether a plaintiff has met the duty to mitigate damages is a question of fact, and therefore properly reserved for the jury where there is a genuine dispute of material over plaintiff's mitigation efforts." *Gates v. Aramark Campus, LLC*, No. CV 21-1081, 2022 WL 245303, at *11 (E.D. Pa. Jan. 24, 2022). And a determination of "reasonableness" is inherently factual and must be based on an assessment of all relevant circumstances. *See Prusky*, 532 F.3d at 259. On this record, a factfinder might conclude that the Plaintiffs failed to take reasonable steps to mitigate their damages, but the factfinder would not be compelled to reach that conclusion.

Accordingly, Defendants' motion for summary judgment on the issue of mitigation will be denied without prejudice as to Plaintiffs Anthony, Clark/Gordon, Freeman, Geibel, and Miliara. The motion will be dismissed as moot as it relates to Rodgers Holdings. The motion

will also be dismissed as moot as it relates to Ronald and Judy Bickel and Alma Lee Britt, because the Court has determined that summary judgment is appropriately entered against those Plaintiffs on other grounds.

(b)

Defendants argue that certain other Plaintiffs (the Bemises, the Guillingers, the Yakimicks, and Richard Zink) fully mitigated their damages by re-leasing to Halcon Energy the same oil and gas rights they purported to lease to SWEPI. Here, the record shows that Halcon Energy paid each of these Plaintiffs $250 per acre more than SWEPI was willing to pay. *See* ECF No. 320, ¶¶8-48. Defendants move for summary judgment against Plaintiffs Bemis, Guillinger, Yakimick and Zink on the grounds that these Plaintiffs are precluded from seeking further damages in this case.

Plaintiffs concede that the claims of the Bemises, the Yakimicks and Richard Zink are fully set-off. As for the Guillingers, the record shows that they are suing on two separate drafts relating to two different leases: one pertaining to property in Mineral Township in Venango County and the other pertaining to property located in Victory Township. *See* ECF No. 328, ¶¶259-285. Defendants are alleging only that the Guillingers fully mitigated their alleged damages relative to the Mineral Township lease, ECF No. 320, ¶¶ 18-29, and Plaintiffs concede that this claim has been fully set-off.

The only matter on which the parties disagree is whether or not the Plaintiffs who are fully mitigated can nevertheless pursue claims for prejudgment interest which, according to Plaintiffs, should accrue from the date of the alleged breach to the date of mitigation. Defendants deny that Plaintiffs are entitled to prejudgment interest on any mitigated losses. They reason that, where the nonbreaching party has suffered no loss, "zero multiplied by any

55

prejudgment interest rate is still zero." ECF No. 466 at 2. They insist that any award of prejudgment interest is contrary to Pennsylvania law, which holds that the theory behind contractual damages is "to make the non-breaching party whole again, not to provide him with a windfall." *Bellefonte Area Sch. Dist. v. Lipner*, 473 A.2d 741, 744 (Pa. Commw. Ct. 1984).

Under Pennsylvania law, a nonbreaching party to a contract may recover interest on the amount due under the contract as a form of damages, even where a right to interest is not specifically addressed in the contract's terms. *See TruServ Corp. v. Morgan's Tool & Supply Co., Inc.*, 39 A.3d 253, 263 (Pa. 2012). The purpose of awarding prejudgment interest is "to compensate an aggrieved party for detention of money rightfully due him or her, and to afford him or her full indemnification or compensation for the wrongful interference with his or her property rights." *Id.* (citing 25 C.J.S. Damages, §80). "The allowance of interest as an element of damages is not punitive, but is based on the general assumption that retention of the money benefits the debtor and injures the creditor. *Id.* (citing 25 C.J.S. Damages, §80). Relevantly, the Pennsylvania Supreme Court has adopted Section 354 of the Restatement (Second) of Contracts as the law of this Commonwealth. *See id.* That Section recognizes "Interest as Damages" and provides that: "If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled." Restatement (Second) of Contracts §354(1).

Because the amounts allegedly due under the leases are ascertainable sums, the rule of Section 354(1) would appear to apply in this case; but because the point is relevant only if Plaintiffs first establish an enforceable contract and a contractual breach, the Court will presently defer on conclusively resolving this issue. Defendants' motion for summary judgment will be

denied without prejudice as it pertains to the mitigated claims of the Bemises, the Guillingers, the Yakimicks, and Richard Zink.

(c)

Defendants assert that Plaintiffs John and Dianna Erwin and Plaintiff Robert Evans were able to partially mitigate their damages by re-leasing their gas and oil rights to other companies who were willing to pay at a rate less than SWEPI was originally willing to pay. Defendants argue that these Plaintiffs should have their damages claims offset by the amounts they were able to obtain through their mitigation efforts.

*The Erwins*

Defendants have presented unrebutted evidence that SWEPI was prepared to pay John and Diana Erwin $3,250 per acre as bonus consideration, or a total of $496,925. See ECF No. 320, ¶¶ 49-51. The Erwins were able to lease the shallow oil and gas rights to the same property to NTS Energy for a total of $6,881.00. *Id.* ¶¶ 55-56. The Erwins also received from NTS Energy $25,263 in royalty payments. *See Id.* ¶ 57. Additionally, as a result of NTS Energy's drilling, the Erwins became owners of sixteen oil and gas wells, which are of an unknown (but potentially significant) value. *Id.* ¶¶ 58-60. Defendants assert that the Erwin's claim of damages in this case should be offset by the amount they received by NTS Energy, which they say is a minimum of $32,144 and potentially much greater. *See id.* ¶¶ 61-62.

Plaintiffs dispute that all of the $32,144 they were paid, plus the value of the shallow oil wells, are mitigation dollars which can be used to reduce their claim against SWEPI. They concede only that the $6,881.00, to the extent it was actually a bonus, can be considered as a potential setoff to their claim against SWEPI. They deny that the royalties and wells should be considered toward any setoff, as those are fruits of the Plaintiffs' new lease with a different

57

company. By Plaintiff's calculation, their claim against Defendants in the amount of $496,925 can be fairly reduced to $490,044 by virtue of the $6,881.00, but no more. Additionally, Plaintiffs contend that they are entitled to prejudgment interest on both the mitigated and unmitigated portions of their claim.

The Court is presently unaware of any authority that would limit the set-off calculation in the manner Plaintiffs advocate. The lease that SWEPI negotiated with Plaintiffs was a paid-up lease with a five-year primary term. During that five-year period, SWEPI would have been under no obligation to conduct drilling or exploration activity. Had SWEPI merely held the lease during the primary term, Plaintiffs' compensation would have been limited to the bonus payment. Therefore, it is logical to conclude that any amounts Plaintiffs obtained during that same five-year period through alternative leasing activity should count toward a mitigation calculus. Of course, costs or losses that Plaintiffs may have incurred as a result of that same activity should also logically be considered. But in any event, the record is presently too underdeveloped for the Court to make any definitive calculations about the appropriate set-off amount.

With respect to Plaintiffs' claim for prejudgment interest, the Court has reserved judgment on that issue, as stated above. Defendants' motion for summary judgment on mitigation issues will be denied without prejudice as to the Erwins.

### Robert Evans

Defendants have presented evidence that SWEPI was prepared to pay Robert Evans $272,188.80 to lease the oil and gas rights to 87.24 acres -- a rate of $3,120 per acre. *See* ECF No. 320, ¶¶ 63-65; *see also* ECF No. 321-6 at 2-3, 9-11. After SWEPI timely surrendered and canceled Evans' lease and returned the draft, Evans leased the oil and gas rights to the same

87.24 acres to Halcon Energy at a rate of $3,000 per acre. *See id.* ¶¶ 68-69; *see also* ECF No. 321-6 at 13, 18. By this Court's calculation, the amount of mitigation set off is $261,720 (87.24 acres x $3,000 per acre = $261,720). The remaining principal amount of Evans' claim would be $10,468.80 ($272,188.80 - $261,720 = $10,468.80).

Plaintiffs responded with the concession that Evans' claim should be offset by $175,740, reducing his claim to $96,448. Defendants reject this position in their reply brief, faulting Plaintiffs for erroneously assuming that Evans re-leased only 58.58 of his 87.24 acres. It appears, however, that in conceding the $175,740 setoff figure, Plaintiffs were merely adopting the figures that Defendants initially stated in their opening brief. See ECF No. 319 at 14. But regardless of Defendants' inadvertent error, upon review of the underlying evidence in the record, the Court finds no genuine dispute that $261,720 is the proper mitigation figure, reducing Evans' principal claim to $10,468.80.

The only dispute beyond this is whether Evans is entitled to prejudgment interest on the portion of his claim that was mitigated. As the Court has reserved ruling on the issue of prejudgment interest, Plaintiffs' motion for summary judgment will be granted only insofar as the Court has determined that Robert Evans' principal damages claim is reduced to $10,468.80. The motion is otherwise denied without prejudice.

## VI.   CONCLUSION

Based upon the foregoing reasons, the Court will deny Plaintiffs' motions for summary judgment, filed at ECF Nos. 330, 332, 335, 336, 338, 340, 342, 344, 346, 348, 350, 352, 354, 356, 361, 363, 366, 368, 370, 372, 374, 376, 378, 380, 382, 385, 387, 389, 391, and 393.

Defendants' Motion for Summary Judgment on the Grounds that No Enforceable Contracts Exists or SWEPI's Performance was Excused, ECF No. 326, will be granted as to the

claims asserted by Plaintiffs Ronald and Judy Bickel, Clayton and Connie Blauser, Alma Lee Britt, Malcom and Sandy Guiste, Rodgers Holdings, and Carol Spellman Seltz (on behalf of the Spellmans). The motion will otherwise be denied. However, Plaintiffs Sumner and Georgene Bemis, John and Diana Erwin, and Robert and Pamela Exley will be directed to show cause as to why summary judgment should not be entered in favor of Defendants and against them, based on their request for a voluntary surrender of their leases.

Defendants' Motion for Summary Judgment as to Plaintiffs Who Did Not or Now Do Not Have Clear Title, ECF No. 322, will be dismissed as moot with respect to Plaintiffs Ronald and Judy Bickel, Clayton and Connie Blauser, and Alma Lee Britt. In all other respects, the motion will be denied.

Defendants' Motion for Summary Judgment on Mitigation, ECF No. 318, will be granted insofar as the Court has determined that Robert Evans' principal damages claim is reduced to $10,468.80. The motion will be dismissed as moot insofar as it relates to Plaintiffs Rodgers Holdings, Ronald and Judy Bickel, and Alma Lee Britt. In all other respects, the motion will be denied without prejudice to Defendants' right to reassert mitigation issues at a later point in this litigation.

Defendants' remaining Motion for Summary Judgment as to All Claims Against Shell Energy Holding GP, LLC, ECF No. 314, will be addressed by way of a separate ruling to be issued in due course.

Plaintiffs' motion for leave to file a belated summary judgment motion on behalf of Robert D. Shaffer, ECF No. 410, will be denied, as the Court perceives no grounds for entering summary judgment in favor of Mr. Shaffer based on the ruling being issued herein. Further,

counsel did not demonstrate good cause for his delinquency, and in any event, Mr. Shaffer has

suffered no prejudice, as his claim is presently preserved by virtue of the Court's ruling.

An appropriate Order follows.

Susan Paradise Baxter
United States District Judge